No. 23-2409

---

# In the United States Court of Appeals

# for the Federal Circuit

---

AMANDA MOJDEH RAISZADEH,

*Petitioner-Appellant,*

v.

DEPARTMENT OF HOMELAND SECURITY,

*Respondent-Appellee.*

_____

On Appeal from the Merit Systems Protection Board
MSPB Docket No. DC-1221-12-0452-B-1
Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member

---

## OPENING BRIEF OF PETITIONER-APPELLANT

The Hennessy Law Firm
Tom Hennessy
4015 Chain Bridge Road, Suite G
Fairfax, VA 22030
(703) 865 8836

*Attorney for Petitioner-Appellant*
AMANDA MOJDEH RAISZADEH

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4(a)(1) and Federal Rule of Appellate Procedure, counsel for Petitioner-Appellant Amanda Mojdeh Raiszadeh certifies the following:

1. The full name of every party or amicus represented in the case by the attorney. Amanda Mojdeh Raiszadeh.

2. The names of the real parties in interest, if different from the parties named above, are: Not applicable.

3. All parent corporations and publicly held companies that own 10 percent or more of the stock of the party represented by us are as follows: Not applicable.

4. The names of all law firms and the partners and associates that appeared for the Petitioner-Appellant in the trial court or are expected to appear in this court are:

> The Hennessy Law Firm
> Tom Hennessy
> 4015 Chain Bridge Road, Suite G
> Fairfax, VA 22030
> (703) 865 8836

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal: Not applicable.

Dated: April 29, 2024              By:  /s/ Tom Hennessy

i

## STATEMENT OF RELATED CASES

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

Dated: April 29, 2024                    By:  /s/ Tom Hennessy

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ................................................................. i

STATEMENT OF RELATED CASES ..................................................... ii

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES ................................................................... v

APPELLANT'S BRIEF .......................................................................... 1

   I.   JURISDICTIONAL STATEMENT ............................................. 1

  II.   STATEMENT OF THE CASE AND FACTS ............................ 1

 III.   SUMMARY OF THE ARGUMENT ......................................... 3

 IV.   STANDARD OF REVIEW ........................................................ 4

  V.   ARGUMENT .............................................................................. 7

     A.   The AJ'S rulings were not consistent with required
procedures, involved an abuse of direction, and the resulting
errors affected the outcome of the case. ................................... 7

        1.   The AJ erroneously admitted into evidence an unsworn,
unsigned, hearsay document, the October 11, 2007, Draft
Focus Group Meeting Notes, in violation of the standard
articulated in *Borninkhof v. Department of Justice*, 5
M.S.P.R. 77, 87 (1981), and its progeny. ........................... 7

        2.   The AJ erroneously admitted unsworn, unsigned hearsay
documents, Agency Exhibits 3 and 4, in violation of the
standard articulated in *Borninkhof v. Department of Justice,*
5 M.S.P.R. 77 (1981), and its progeny. .............................. 13

     B.   The AJ made findings of fact that are contrary to the record
and to Board findings of fact. ................................................. 15

     C.   The Agency introduced no evidence that it would have
terminated Appellant even in Absence of her Disclosure. .................... 19

     D.   The Initial Decision is based on an erroneous application of
the law to the facts of this case. ............................................. 20

        1.   The AJ's Credibility determination is not supported by the record. .. 20

2.  The AJ failed to apply the clear and convincing evidence standard to the facts of this case. ...................................................... 29

E.  New and Material Evidence regarding the October 11, 2007, Focus Group Meeting notes not available when the record was closed establishes that the Agency did not secure a copy of this document until over a year after Appellant's testimony............. 42

VI.  CONCLUSION AND RELIEF SOUGHT ............................................... 43

ADDENDUM ..................................................................................... 44

CERTIFICATE OF COMPLIANCE .................................................... 105

CERTIFICATE OF SERVICE .......................................................... 106

# TABLE OF AUTHORITIES

Page

**Cases:**

*Awa v. Dep't of the Navy*
41 M.S.P.R. 318 (1989) ................................................................. 22

*Borninkhof v. Dep't of Justice*
5 M.S.P.R. 77 (1981) ................................................. 3, 4, 11, 12, 13

*Carr v. Soc. Sec. Admin.*
185 F.3d 1318 (Fed. Cir. 1999) ....................................................... 5

*Chambers v. Dep't of the Interior*
116 M.S.P.R. 17 (2011) ................................................................. 33

*Coy v. Dep't of the Treasury*
43 F.4th 1334 (Fed. Cir. 2022) ....................................................... 6

*Faucher v. Dep't of the Air Force*
96 M.S.P.R. 203 (2004) ................................................................. 20

*Garza v. Dep't of the Army*
11 F.3d 1073 (1993) ..................................................................... 22

*Garza v. Dep't of the Army*
57 M.S.P.R. 214 ......................................................................... 22

*Leatherbury v. Dept' of the Army*
524 F.3d 1293 (Fed. Cir. 2008) ..................................................... 20

*Miller v. Dep't of Justice*
842 F.3d 1252 (Fed. Cir. 2016) ....................................................... 6

*Mitchum v. Tenn. Valley Auth.*
756 F.2d 82 (Fed. Cir. 1985) ......................................................... 6

*Newby v. E.P.A.*
135 F.3d 777 (Fed. Cir. 1998) ....................................................... 5

*O'Keefe v. U.S. Postal Serv.*
318 F.3d 1310 (Fed. Cir. 2002) ....................................................... 6

*Rodriguez v. Dep't of Homeland Sec.*
117 M.S.P.R. 188 (2011) ............................................................... 20

*Russell v. Dep't of Justice*
  76 M.S.P.R. 317 (M.S.P.B. 1997) ................................................... 6, 29

*Sanders v. U.S. Postal Serv.*
  801 F.2d 1328 (Fed. Cir. 1986) ........................................................ 11

*Smith v. Gen. Servs. Admin.*
  930 F.3d 1359 (Fed. Cir. 2019) ................................................... 30, 32

*Soc. Sec. Admin. v. Carr*
  78 M.S.P.R. 313 (1998)
  aff d, 185 F. 3d 1318 (Fed. Cir. 1999) ........................................... 29

*Soc. Sec. Admin. v. Long*
  2010 M.S.P.B. 19 (2010) ................................................................... 22

*Universal Camera Corp. v. NLRB*
  340 U.S. 474 (1951) ........................................................................... 20

*Vaughn v. United Postal Serv.*
  109 M.S.P.R. 469 (2008) ................................................................... 11

*Whitmore v. Dep't of Labor*
  680 F.3d 1353 (Fed. Cir. 2012) .............................................. 5, 6, 29

*Yunus v. Dep't of Veterans Affairs*
  242 F.3d 1367 (Fed. Cir. 2001) ....................................................... 29

## Statutes:

5 U.S.C. § 1221 ...................................................................................... 2

5 U.S.C. § 7703 ................................................................................... 20

28 U.S.C. § 1295 .................................................................................. 1

## Other:

5 C.F.R. § 1201.115 .......................................................................... 42

135 Cong. Rec. H747–48 (daily ed. Mar. 21, 1989) ............................ 6

## APPELLANT'S BRIEF

### I.  JURISDICTIONAL STATEMENT

On July 20, 2023, the Merit Systems Protection Board ("MSPB") issued a Final Order denying Appellant's Petition for Review and affirming the Administrative Judge's Initial Decision of November 23, 2016. Appx1–7. On September 15, 2023, Appellant filed a timely Notice of Appeal. Appx1834–1844. This Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(9).

### II.  STATEMENT OF THE CASE AND FACTS

The agency appointed the Appellant to the position of Citizen and Immigration Services (CIS) Assistant in March 2007, and converted her position to a Supervisory CIS Assistant in April 2007. Appx33. In or around November 21, 2007, the Appellant and a coworker met with the Agency's Office of Inspector General (OIG) to report an open safe containing unsecured naturalization certificates, a violation of Agency policy. Appx1576–1579; Appx33. On December 28, 2007, the Appellant's supervisor Susan Dibbins rated her performance as unacceptable overall. Appx33. In a January 2008 letter to OIG, the Appellant memorialized her November 21, 2007, report that a safe containing sensitive naturalization certificates had been left open in June 2007. Appx33. On February 19, 2008, Susan Dibbins issued a termination notice to the Appellant that cited performance deficiencies during her probationary period. Appx33.

1

In September 2011, the Appellant filed a complaint with the Office of Special Counsel (OSC) asserting that the Agency gave her a poor performance evaluation and terminated her in retaliation for her November 2007 disclosures to OIG, which included both the issue with the safe in June 2007, and information concerning other personnel problems in her office. Appx33. After a hearing on the merits, the Administrative Judge (AJ) denied corrective action. Appx49–51. Specifically, she found that the Appellant failed to prove that she made a protected disclosure because she did not have a reasonable belief that her disclosure was protected. Appx49–51. The Administrative Judge did not address whether the disclosure was a contributing factor in the Appellant's performance appraisal or termination, or whether the Agency proved by clear and convincing evidence that it would have taken those actions in the absence of the disclosure. Appx47.

By Order dated December 9, 2015, the Merit Systems Protection Board (Board) granted Appellant's petition for review of the AJ's January 27, 2015, Initial Decision, reversing the AJ's finding that Appellant has not carried her burden to show by preponderant evidence that she made a protected disclosure and that the disclosure was a contributing factor in a personnel action taken against her within the meaning of 5 U.S.C. § 1221(e)(1). Appx32–58. "Specifically, [the Board found] that it is necessary to remand the appeal for the administrative judge to assess whether the agency proved by clear and convincing evidence that is would have assigned the appellant an unacceptable performance rating and terminated her employment in the absence of her disclosure." Appx33. The Board found that Appellant's immediate supervisor Susan Dibbins "at least had constructive

knowledge of the Appellant's disclosure", and on remand directed the AJ "to decide if the agency has established by clear and convincing evidence that it would have taken the same actions in the absence of Appellant's disclosure." Appx1747.

On November 23, 2016, the AJ issued her Initial Decision "that Ms. Dibbins was unaware of the disclosure concerning the June 7, 2007 [sic] safe incident until after the termination decision was made[,] and that the Agency would have taken the same termination action even in the absence of the whistleblowing activity". Appx1747.

On July 20, 2023, the Board issued a Final Order denying Appellant's petition for review and affirming the November 23, 2016, Initial Decision, which is now the Board's final decision. Appx2.

On September 15, 2023, Appellant filed a Petition for Review/Notice of Appeal in this Court. Appx1838.

## III.  SUMMARY OF THE ARGUMENT

The AJ'S rulings were not consistent with required procedures, involved an abuse of direction, and the resulting errors affected the outcome of the case. The AJ erroneously admitted into evidence an unsworn, unsigned, hearsay document, the October 11, 2007, Draft Focus Group Meeting Notes, in violation of the standard articulated in *Borninkhof v. Dep't of Justice*, 5 M.S.P.R. 77, 87 (1981), and its progeny.

The AJ erroneously admitted unsworn, unsigned hearsay documents, Agency Exhibits 3 and 4, in violation of the standard articulated in *Borninkhof v. Dep't of Justice*, 5 M.S.P.R. 77, and its progeny.

The AJ made findings of fact that are contrary to the record and to Board findings of fact.

The Agency introduced no evidence that it would have terminated Appellant even in Absence of her Disclosure.

The Initial Decision is based on an erroneous application of the law to the facts of this case.

The AJ's Credibility determination is not supported by the record.

The AJ failed to apply the clear and convincing evidence standard to the facts of this case.

New and Material Evidence regarding the October 11, 2007, Focus Group Meeting notes not available when the record was closed establishes that the Agency did not secure a copy of this document until over a year after Appellant's termination and could not have relied upon it to support her termination.

## IV.   STANDARD OF REVIEW

This Court reviews the question of whether the agency would have taken the same adverse personnel action absent the protected whistleblower disclosures in light of three non-exclusive factors known as the *Carr* factors: (1) "the strength of the agency's evidence in support of its personnel action"; (2) "the existence and strength of any motive to retaliate on the part of the agency officials who were

involved in the decision"; and (3) "any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated." *Carr v. Soc. Sec. Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999). Evidence must leave the Board with a "firm belief" that the personnel action would have still taken place if not for the disclosure. *Newby v. E.P.A.*, 135 F.3d 777 (Fed. Cir. 1998). The Federal Circuit has further clarified that "[e]vidence only clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record, and despite the evidence that fairly detracts from that conclusion." *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1368 (Fed. Cir. 2012). In *Whitmore* this Court held "there is no doubt that Congress considered it very important that federal agencies be required to clearly and convincingly rebut a *prima facie* case of whistleblower retaliation," while quoting legislative history that describes the significance of the Government's burden:

> "Clear and convincing evidence" is a high burden of proof for the Government to bear. It is intended as such for two reasons. First, this burden of proof comes into play only if the employee has established by a preponderance of the evidence that the whistleblowing was a contributing factor in the action—in other words, that the agency action was "tainted." Second, this heightened burden of proof required of the agency also recognizes that when it comes to proving the basis for an agency's decision, the agency controls most of the cards—the drafting of the documents supporting the decision, the testimony of witnesses who participated in the decision, and the records that could document whether similar personnel actions have been taken in other cases. In these circumstances, it is entirely appropriate that the agency bear a heavy burden to justify its actions.

*Whitmore*, 680 F.3d at 1367 (quoting 135 Cong. Rec. H747–48 (daily ed. Mar. 21, 1989) (explanatory statement on Senate Amendment to S. 20)). *See also, Miller v. Dep't of Justice*, 842 F.3d 1252, 1258 (Fed. Cir. 2016). "An agency's decision 'to dismiss a federal employee must have a "rational basis supported by substantial evidence from the record taken as a whole." ' " *O'Keefe v. U.S. Postal Serv.*, 318 F.3d 1310, 1313 (Fed. Cir. 2002) (*quoting Mitchum v. Tenn. Valley Auth.*, 756 F.2d 82, 85 (Fed. Cir. 1985)). *See also, Coy v. Dep't of the Treasury*, 43 F.4th 1334 (Fed. Cir. 2022).

Where comparator evidence exists, "the agency is required to come forward with all reasonably pertinent evidence." *Whitmore*, 680 F.3d at 1374. Failure to do so "may be at the agency's peril" because "the absence of any evidence concerning *Carr* factor three may well cause the agency to fail[.]" *Id.* at 1372–73; *see also Russell v. Dep't of Justice*, 76 M.S.P.R. 317, 327–328 (M.S.P.B. 1997) (weighing the three *Carr* factors to find that the agency did not meet its burden where "strong evidence to support their reports concerning the appellant" was outweighed by a motive to retaliate and a lack of comparable treatment of non-whistleblowers). Where the Board's decision fails to evaluate evidence, the Appellate Court cannot be assured that it was given the consideration and weight appropriate in a *Carr* analysis. *See Whitmore*, at 1376 ("While we acknowledge that the [Board] may well have considered the countervailing evidence and rejected or discounted it for various reasons, with no basis in [its] opinion to understand [its] logic, we cannot say that [its] analysis is reasonable or complies with the law for how proof by clear and convincing evidence is to be evaluated.").

## V.  ARGUMENT

### A.  The AJ'S rulings were not consistent with required procedures, involved an abuse of direction, and the resulting errors affected the outcome of the case.

#### 1.  The AJ erroneously admitted into evidence an unsworn, unsigned, hearsay document, the October 11, 2007, Draft Focus Group Meeting Notes, in violation of the standard articulated in *Borninkhof v. Department of Justice*, 5 M.S.P.R. 77, 87 (1981), and its progeny.

The AJ's finding that the Agency "would have taken the same termination action even in the absence of her whistleblowing activity" relies substantially and decisively on an unsworn, unsigned, unauthenticated hearsay document titled "DRAFT FOCUS GROUP MEETING NOTES" (hereinafter "Draft Notes"), authored by a biased union representative of Appellant's subordinates. Appx62–67. Reliance by the AJ on the Draft Notes is so critical to the AJ's finding that she cites it no fewer than seven times in her 23-page Initial Decision, and her direct quotes from the Draft Notes take up more than one full page of her Initial Decision. Appx9, Appx11, Appx17–18. This document was admitted into evidence over the strenuous pre-hearing and hearing hearsay and authentication objections of Appellant's counsel, and apparently consists of union representative Michael Knowles's unverified, unsigned, unauthenticated personal notes of anonymous clerical unit employee complaints about Appellant, who was their supervisor. Appx199, Appx1678–1679. The document was drafted in preparation for a "Focus Group" mediation that never occurred, and there is absolutely no evidence that the

Agency relied upon the Draft Notes in its decision to terminate Appellant. Appx1489–1490, Appx1707, Appx1464–1467, Appx1501. Dibbins gave a convoluted but ultimately affirmative response to the Agency counsel's hypothetical question "would you have considered those notes as part of [Appellant's] rating?" Appx1707. Dibbins never testified that she did in fact rely upon the Draft Notes as support for Appellant's termination. Indeed, Dibbins does not mention or refer to the Draft Notes in any document related to her termination decision, including her November 28, 2007, email to Berkenkemper in which she recites five specific "incidents" causing her to "get[] very close to a decision to terminate [Appellant]" (Appx274–276), and her "2007 Performance Plan and Appraisal" dated December 28, 2007 (Appx265–273). In fact, she doesn't reference the Draft Notes in *any* document.

Dibbins's testimony that she received the Draft Notes "on or around October 11, 2007" (Appx1680) is wholly inconsistent with Michael Knowles's October 15, 2007, email restricting circulation of the Draft Notes to the Clerical Unit employees. Appx1749, Appx1863. Significantly, the emails in which Appellant's second line supervisor Greg Christian and Berkenkemper discuss the union meeting do not reflect that the Draft Notes had been forwarded to them as an attachment, and Dibbins is not copied on any of those emails. The copy of the Draft Notes entered into evidence by the Agency was an exhibit to the Report of Investigation (ROI) prepared on December 9, 2008, for Appellant's EEO Complaint, bearing the ROI exhibit stamp. Appx1776–1779. The Agency never produced any other version of the Draft Notes, suggesting that the document did

not come into possession of the Agency's management until sometime after preparation of the ROI almost one year after Appellant's termination. Aside from Dibbins's incredible testimony that she "receive[d] the [Draft Notes] on or around October 11, 2007" (Appx1680), the very day it was prepared and four days before Knowles instructs his assistant Whitfield to circulate the Draft Notes "only" to the Clerical Unit employees (Appx1749), there is no evidence that any of Appellants' supervisors saw the Draft Notes at any time before her termination on February 19, 2008, let alone relied upon the document in the termination decision.

The Agency did not call Knowles, the purported author of the Draft Notes, as a witness at the hearing, did not call any of the Appellant's anonymous subordinates allegedly quoted in the Draft Notes, and offered no explanation for its failure to call any of those witnesses. Moreover, it is undisputed that as the union representative of Appellant's subordinates, Knowles was "an advocate for the Clerical Unit employees [whose] role was to represent them in, essentially, whatever fashion he saw fit to do." Appx1493. It is undisputed that the Draft Notes were prepared to advocate for the Clerical Unit employees' position and for the very specific occasion of a Focus Group meeting that never took place. Appx1690; Appx1489–1490.

Finally, the anonymous complaints of the unidentified declarants allegedly quoted by Knowles in the Draft Notes are disputed by record evidence which the AJ fails to address. See, e.g., Appx242, a June 22, 2007, email from Appellant's subordinate Sandra Bridges to Appellant ("I feel that since [Appellant] has come aboard, she is getting the job done. Situations that should have been or were

addressed in the past are being handled in the appropriate manner. Work habits and work assignments are being addressed and resolved. She is doing the job she was hired to do.…she just wants her staff to do their job correctly and expeditiously."). See also Appx243, June 26, 2007 email from Appellant's subordinate James P. Raymond to Appellant ('When Appellant became the new Exams supervisor there was argument and confrontation from the start from these two federal employees, Josie Brown and Joyce Irby. Every other Exams employee has accepted [Appellant] as the CIS supervisor in charge of the Exams unit and whatever differences we may have had with her have been amicably resolved so that, but for these two, we would be working in a relatively stress-free and productive environment."). Most significantly, the content of the Draft Notes is specifically disputed by Mitch Berkenkemper, management advisor to Susan Dibbins, who summarized his recommendation on the "union report on focus group" in email dated October 17, 2007, as follows:

> I believe we should give the 'soft approach' (the Focus Group) every opportunity to succeed, but if the employees refuse to cooperate and it becomes necessary to move to the 'hard approach', I think [Appellant] needs assurance from you that she'll have your backing…I think she sincerely wants to make the unit run better, but she's also concerned that the employees will set her up and get her fired if she attempts to hold them accountable for their conduct or performance. She seems to feel as though she's walking a tightrope: she wants her staff to be happy and do their jobs well and to have a productive unit, yet she feels a responsibility to correct the conduct and performance problems she's seeing.

Appx1751, Appx1863. The AJ completely disregards Berkenkemper"s support of Appellant and condemnation of the Clerical Unit employees allegedly interviewed by Knowles to prepare Draft Notes.

The content of the Draft Notes is also disputed by Appx240-241, the November 9, 2007 memorandum from Gregory W. Christian, District Director, to Appellant's Clerical Unit Employees, in which he addresses gross insubordination by Appellant's subordinates, including "[t]earing up a leave slip and throwing it at the supervisor"; "[m]aking inappropriate comments about the supervisor's nationality and religion"; and "security violations" ("e.g. safe left open"). Berkenkemper testified that as of November 9, 2007, management was supporting Appellant with regard to the issues set out in Appx111–112, Appx1492.

Before accepting the Draft Notes as sufficient to establish by clear and convincing evidence that the Agency would have terminated Appellant even in the absence of her complaint to OIG, the AJ was required to make a reasoned judgement as to the probative value of the Draft Notes using the factors outlined in *Borninkhof v. Dep't of Justice*, 5 M.S.P.R. 77, and its progeny. *See, e.g., Vaughn v. United Postal Serv.*, 109 M.S.P.R. 469 (2008); *Sanders v. U.S. Postal Serv.*, 801 F.2d 1328, 1331 (Fed. Cir. 1986) ("[H]earsay must be evaluated on a case-by-case basis to determine if the hearsay is inherently truthful and more credible than the evidence offered against it."). Despite her decisive reliance on the Draft Notes, the AJ failed to make any reasoned judgement or analysis as to the probative value of that document.

11

The following factors affect the weight to be accorded to hearsay evidence: (1) the availability of persons with firsthand knowledge to testify at the hearing; (2) whether the statements of the out-of-court declarant were signed or in an affidavit form, and whether anyone witnessed the signing; (3) the agency's explanation for failing to obtain signed or sworn statements; (4) whether declarants were disinterested witnesses to the events, and whether the statements were routinely made; (5) consistency of declarant's accounts with other information in the case, internal consistency, and their consistency with each other; (6) whether corroboration for statements can otherwise be found in the agency record; (7) the absence of contradictory evidence and (8) credibility of declarant when he made the statement attributed to him. *Borninkhof v. Dep't of Justice*, 5 M.S.P.R. 77.

Applying factors 1, 2, 3, 4, and 5 to this case, the Agency has offered no explanation as to why it did not obtain Knowles's signature, sworn or otherwise, on the Draft Notes, or the signatures of the unidentified, anonymous clerical employee declarants; neither has the Agency explained why it failed to present at the hearing *any* witnesses with firsthand knowledge of the subject matter of the Draft Notes. Indeed, the Agency failed to call even a single witness with any first-hand knowledge of Appellant's alleged deficiencies as a supervisor. As noted by the Board in *Borninkhof* with respect to similar unsworn, unsigned, unauthenticated documents erroneously entered into evidence in support of an Agency action, "[a]lthough the statements were consistent with each other, the declarants were actors to a greater or lesser degree in the incidents at issue and cannot be considered disinterested; the statements were not routinely made; nor have

12

statements of this kind traditionally enjoyed judicial acceptance at hearings." *Id*. at 87. Neither Michael Knowles, the union representative for the unidentified, anonymous declarants allegedly quoted in the Draft Notes, nor the declarants themselves, an unspecified number of Appellant's aggrieved subordinates, "were disinterested witnesses to the events," nor was there any evidence that the Draft Notes, prepared for a specific Focus Group Meeting, were "routinely made."

Applying factors 6, 7 and 8, absolutely no corroboration for the anonymous complaints of the declarants in the Draft Notes can be found in the record, there is contradictory record evidence in Exhibit B from Appellant's subordinates Sandra Bridges and James P. Raymond which was not even addressed by the AJ, and the credibility of the anonymous declarants is doubtful given their bias, and in any event, is impossible to assess given those declarants' anonymity.

> **2. The AJ erroneously admitted unsworn, unsigned hearsay documents, Agency Exhibits 3 and 4, in violation of the standard articulated in *Borninkhof v. Department of Justice,* 5 M.S.P.R. 77 (1981), and its progeny.**

Appellant objected to introduction into evidence of an unsigned, unverified, unauthenticated August 28, 2007, hearsay memorandum purportedly from Clerical unit employee Joyce Irby titled "Hostile Environment." Appx199. Appellant also objected to an unsigned, unauthenticated, August 28, 2007, hearsay document titled "MEMO; RECORD OF EVENTS BETWEEN MS. BRIDGES AND MS. AMANDA RAISZADEH." Appx198–199.

The agency failed to call the purported authors and/or subjects of these documents as witnesses at the hearing and offered no explanation for its failure to do so. The documents are unsigned, and the Agency offered no explanation for its failure to obtain signed or worn statements from these employees. The declarants were obviously not disinterested witnesses to the events, and there is no evidence that statements like these were routinely made. The Sandra Bridges MEMO is inconsistent with her own June 22, 2007, email, Appx242, in which she writes "I feel that since [Appellant] has come aboard, she is getting the job done. Situations that should have been or were addressed in the past are being handled in the appropriate manner. Works habits and work assignments are being addressed and resolved. She is doing the job she was hired to do so… She just wants her staff to do their job correctly and expeditiously." The AJ fails to address this inconsistent evidence. Moreover, there is contradictory evidence consisting of praise for Appellant and condemnation of two Clerical Unit employees who are deemed the source of the Clerical Unit's problems (see Appx242–243), Sandra Bridges and Pat Raymond June 22, 2007, and June 26, 2007, emails, respectively), but the AJ fails to address this evidence, noting simply "In August 2007, two of the Appellant's subordinate employees complained that the appellant subjected them to a hostile work environment." Appx10-11.

Accordingly, all eight of the *Borninkhof* factors weighs against admissibility of the Agency's hearsay exhibits 3 and 4, which were relied upon by the AJ, and in any event the AJ failed to conduct any analysis of those factors in overruling Appellants' objections to those exhibits and admitting them into evidence.

14

Finally, it is noteworthy that the AJ refused to admit into evidence the Appellant's exhibits consisting of the Flores and Berkenkemper sworn deposition transcripts taken in this action, while admitting into evidence and giving decisive weight to unauthenticated, unsigned, anonymous hearsay documents offered by the Agency.

### B. The AJ made findings of fact that are contrary to the record and to Board findings of fact.

The Initial Decision is replete with findings of fact and conclusions from those findings that are either wholly unsupported by Record evidence or contradicted by that evidence. For example, on Appx11 of her Initial Decision the AJ states "[a]fter the Focus Group report was issued on October 11, 2007, management officials discussed techniques to correct the appellant's behavior while continuing to support her as a supervisor." Appx11. As support for this finding, the AJ cites the October 11, 2007, the AJ cites the October 11, 2007, Draft Notes, which are not notes of a Focus Group meeting, which in fact never took place, but rather a compendium of anonymous complaints allegedly summarized by the Clerical Unit's union representative in preparation for a Focus Group meeting that was repeatedly postponed and ultimately cancelled when Dibbins terminated Appellant's employment. *See* Appx339–344, Appx1501, Appx1690.

The AJ's finding "that Ms. Dibbins was unaware of the disclosure concerning the June 7, 2007 [sic] safe incident until after termination decision was made" contradicts the December 9, 2015 Board findings that "[t]he agency does not

dispute the testimony of either of these individuals [Berkenkemper and Flores] and the Board finding that "because those who advised [Dibbins] concerning the personnel actions knew about the disclosure, we find that she had at least constructive knowledge of the disclosure."

The AJ makes a significant error in confusing the timing of emails sent by Berkenkemper to Dibbins concerning the schedule of a Focus Group mediation, the purpose of which was not, as stated by the AJ, "to deal with appellant's shortcomings", but rather, as stated in Berkenkemper's November 28, 2007 email sent to Dibbins *before he* had received Dibbins's November 28 email stating that she was "getting very close to a decision to terminate [Appellant]," to present Appellant's "employees with two options to improve their behavior: the hard way (counseling/discipline) or the easy way (mediation/focus group)." Appx335-338. In contrast to the AJ's statements at page 4 of her Initial Decision (Appx11), Berkenkemper's November 28, 2007, email makes no mention of any purpose for the Focus Group except as a means to address *employee* misconduct, with absolutely no suggestion that Appellant's alleged "shortcomings" were at that time on the Focus Group agenda. The AJ conflates Berkenkemper's December 4, 2007, email, drafted well after his receipt of Dibbins's November 28 email about "getting close to a decision to terminate [Appellant]", with his November 28 email stating unambiguously that the Focus Group was being organized exclusively to address the disciplinary and performance problems of Appellant's Clerical Unit subordinates, and not any of Appellant's alleged "shortcomings". Appx60–61.

The AJ dismissed the testimony of Bailey, who supported all the Appellant's claims, including Appellant's testimony that Dibbins's attitude toward Appellant became hostile immediately after Appellant and Bailey met with OIG, by concluding "I found Ms. Bailey to be less than credible, and she appeared to have a bias to help the appellant's case." Appx23. In support of this conclusion the AJ falsely asserts that "[w]ith regard to Ms. Bailey, her testimony that she set-up the meeting with the OIG about the safe being left open is contradicted by Agent Herlihy who testified the meeting was organized for purpose of the Hadeed investigation." Appx23. The AJ does not cite to the record to support this attack on Cheri Bailey's credibility. A comparison of the testimonies of Bailey and Herlihy reveals that the witnesses do not contradict each other.

> HENNESSY: Okay. Who is James Izzard?
>
> BAILEY: James Izzard is the OIG special agent that I was working with.
>
> HENNESSY: All right. And did you speak with James Izzard about arranging a meeting with [Appellant] and you?
>
> BAILEY: Yes.
>
> HENNESSY: Did you give [Appellant] Mr. Izzard's number so that she could talk with him?
>
> BAILEY: Yes.

Appx1570, Appx600, Herlihy merely testified that his "understanding was that the meeting was arranged because [Bailey] had information about Hadeed…" Both Bailey and Herlihy agree that Bailey arranged the meeting through James Izzard. There is no evidence that Bailey spoke with Herlihy before the meeting, and Bailey was never asked what she told Izzard about the purpose of the meeting. Indeed, Herlihy seems to have simply assumed that the meeting with Bailey and Appellant was about Hadeed.

> MR. HERLIHY: two of the special agents that worked for us, James Izzard and Karen Jordan, had evidently made arrangements for Ms. Raiszadeh to come to the office to be brought into the office by another CIS employee by the name Cheri Bailey. My understanding was that she was coming to discuss her knowledge of Micheal Hadeed;… I don't know if Bailey had worked on the Hadeed case but M.. Bailey was providing assistance to our office in connection with other investigations in the CIS office so Ms. Bailey was someone who was working with our office. The impression therefore was that Ms. Bailey was bringing someone that had valuable information to provide about Hadeed and other criminal activity.

Appx1779–1801, Appx600-602. The AJ seeks to discredit Bailey as a witness based on a false impression formed by Herlihy, with no evidence that Bailey did or said anything to anyone that caused Herlihy to form this impression. The great deference owed to an administrative Judge's credibility determination in resolving conflicting testimony, see *Boeber v. Dep't of the Army*, 287 F. 3d 1358, 1364 (Fed. Cir. 2002), is irrelevant where, as here, the testimony in question is not in conflict.

Similarly, in supporting her disregard of *all* of Bailey's testimony, both disputed and undisputed, the AJ misstates the record in finding "it is not believable that the

appellant and Ms. Bailey met with OIG unit late in the evening on Thanksgiving eve.: Appx23–24. Bailey never testified that she and Appellant met with OIG until "late in the evening" on Thanksgiving eve. Bailey merely testified that on November 21 "when we came out [of the OIG meeting], it was night…It was dark." Appx1574. This Court can take judicial notice that in late November in Northern Virginia it is "night" or "dark" by approximately 6:00 PM, and that 6:00 PM is not "late in the evening." The early evening conclusion of the November 21 OIG meeting is corroborated by Appellant's phone record showing a gap in the record of her phone calls from 3:41 PM, when she and Bailey began her OIG meeting, until 6:34 PM, when the meeting concluded (at a time when it would have been "dark" or "night" but not "late in the evening"). Appx905–908.

### C. The Agency introduced no evidence that it would have terminated Appellant even in Absence of her Disclosure.

The record is devoid of any evidence that the Agency would have terminated Appellant even in the absence of her disclosure. Indeed, the Agency's counsel never asked this question of Dibbins, the deciding official. For this reason alone, the Board should grant this petition.

**D. The Initial Decision is based on an erroneous application of the law to the facts of this case.**

**1. The AJ's Credibility determination is not supported by the record.**

An AJ's credibility determination is not owed deference where the findings are incomplete, inconsistent with the weight of the evidence, and do not reflect the record as a whole. *Faucher v. Dep't of the Air Force*, 96 M.S.P.R. 203, ¶ 8 (2004). The Board must set aside findings when they are unsupported by substantial evidence. 5 U.S.C. § 7703(c)(3). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *accord Leatherbury v. Dept' of the Army*, 524 F.3d 1293, . 1300 (Fed. Cir. 2008). The AJ did not support her finding with substantial evidence. Moreover, the AJ based her decision on the Draft Notes without any evidence that the Agency relied on that document in deciding to terminate Appellant's employment. It is well established that "[t]he Board will not sustain an agency action on the basis of a charge that could have been brought but was not." *Rodriguez v. Dep't of Homeland Sec.*, 117 M.S.P.R. 188, ¶ 8 (2011).

The AJ "found Ms. Dibbins' [sic] to be a direct, straightforward witness, and [she] discerned no ambiguity or subterfuge in her testimony." Appx21. In stark contrast, the AJ "was unimpressed with the appellant's demeanor as she appeared evasive, chaotic and at times bordering on incoherent." Appx23. Examination of the reasons given by the AJ for these diametrically opposed credibility assessments

reveals that her determination is woefully incomplete, inconsistent with the weight of the evidence, and is inconsistent with any fair reading of the record as a whole.

First, the AJ concludes that "based on the sheer number of complaints about appellant from her subordinates, it defies common sense to believe that the appellant was unaware that her performance was problematic prior to her performance review in January 2008." Appx23.

Of course, the "sheer number of complaints" consists almost entirely of the Draft Notes and other hearsay documents prepared by the Clerical Unit employees' union representative, in preparation for a Focus Group mediation that never took place, and at a time when management unreservedly supported Appellant. As late as November 28, 2007, Berkenkemper described the purpose of the planned Focus Group mediation as "presenting *the employees* with two options to improve their behavior; the hard way (counseling) or the easy way (mediation/focus group)." Appx60–61, Appx339-343 (Emphasis added). There is no evidence that any of the "employee complaints" set forth in the Draft Notes played any role at all in the Agency's termination of Appellant. Finally, Dibbins's own prior sworn testimony in the EEO matter was that *she never gave Appellant any prior written or verbal counseling, and that she never received any complaints about Appellant*. Appx1709–1711, Appx1696.

The AJ found Appellant's testimony incredible because Appellant testified in 2009 in a deposition given in an EEO matter that she met with the OIG in December 2007, but allegedly "chang[ed] her position" and testified in the present action that her OIG meeting took place a few days earlier on November 21, 2007.

Appx21. Similarly, the AJ concludes that Appellant is willing to "mix-up the facts to such a degree to make a plausible winning argument" because Appellant explained that her testimony in the prior matter that she had met with OIG in December, 2007 (rather than on November 21, 2007) was an estimation, which Appellant deemed sufficiently accurate in that employment discrimination case in which the precise date of the meeting had no significance. Appx929–931. The AJ also attaches decisive significance to another slight discrepancy between Appellant's EEO testimony and her hearing testimony concerning when she told Susan Dibbins about her OIG meeting (January 2008 vs. November 26 or 27, 2007, respectively). In so holding, the AJ has disregarded the principle established in *Garza v. Dep't of the Army*, 57 M.S.P.R. 214, 222 (a slight discrepancy was insufficient to find that the witness lacked credibility) (citing *Awa v. Dep't of the Navy*, 41 M.S.P.R. 318, 321 (1989)), *aff'd*, 11 F.3d 1073 (Fed. Cir.1993) (Table). See also, *Soc. Sec. Admin. v. Long*, 2010 M.S.P.B. 19 (2010).

    The Record evidence supporting Appellant's OIG meeting on November 21, 2007, is compelling. November 21, 2007, was the last workday before the four-day Thanksgiving holiday. Also, we know that the Appellant and Bailey went to OIG on November 21, 2007, because that was the only day when both of them took time off. Appx1573–1574. Furthermore, Appellant has a detailed memory of purchasing chicken for her subordinates on the last day before Thanksgiving and also on the day that Bailey went to OIG. Appx1571–1572. Moreover, the record of the Appellant's phone calls that day supports her recollection that November 21, 2007, was the only day when she and Bailey could have gone to OIG. That record,

about which Appellant gave testimony, shows that Appellant made three calls to Berkenkemper, including a 23-minute conversation during which Berkenkemper advised Appellant to go to OIG about the safe issue. Appx1476–1477. Appellant testified that the record of her phone call on November 21 shows additional calls to Mary Flores, and a period from 1:24 PM until 3:41 PM with no incoming or outgoing calls, a one minute call at 3:41 PM, and another gap with no calls from 3:41 until 6:34 PM. Cheri Bailey testified that she took her lunch break on November 21 at 1:30 PM and began her administrative leave to go to OIG with Ms. Raiszadeh at 2:30 PM. Appx1574.

The Agency offered the testimony of Timothy Herlihy for the purpose of creating an issue as to whether Ms. Raiszadeh made her complaint to OIG before or after November 28, 2007, the very first occasion when Dibbins produced anything in writing expressing dissatisfaction with Ms. Raiszadeh's conduct or performance, but Herlihy does not know whether Ms. Raiszadeh made her OIG complaint on November 21, 2007, or on some other day. Appx 1808–1809. The AJ emphasizes Appellant's prior testimony that she first complained to OIG in December 2007. Appellant testified credibly that when she gave this testimony and made these statements, in most instances in EEO proceedings that concluded before the institution of this action, she attached no significant to the precise date of her OIG complaint and was merely providing an estimate. Appx1443–1445. Ms. Raiszadeh's testimony in this proceeding that she estimated "December" for a date that was actually November 21 is credible and does not create any genuine conflict with the unrebutted testimony of Cheri Bailey and Mary Flores.

23

Finally, and most conclusively, Ms. Raiszadeh testified that her timesheets for the pay periods in November and December 2007, establish that the only day during that time period when both Cheri Bailey and Ms. Raiszadeh could have taken time from work to go to OIG was November 21. Appx311–314. A comparison of the time sheets of Ms. Raiszadeh and Cheri Bailey reveals that the only days they both had time off during the workday were November 21 (during pay period 23), and December 6 (pay period 24). Appx311. Indeed, in pay period 24 (November 26 through December 7) Ms. Raiszadeh worked overtime every workday. Ms. Raiszadeh could not have gone to OIG on December 6 because she had a consultation with EEO attorney Alan Leschat on that day, and Ms. Bailey could not have gone to OIG on that day because, as demonstrated in Show Document 10, her leave on that day was attributable to a "snow day." On Ms. Raiszadeh's timesheet for pay period 25, the only day she took any time off was December 10, and her undisputed testimony is that she was ill on that day, an illness that caused her to seek treatment at Urgent Care on December 14. Appx1431.

In rejecting Appellant's explanation for the forgoing date discrepancies and deciding that the conflict of a few days in Appellant's testimony about the dates of meetings that had taken place years earlier undermined her credibility as a witness, the AJ states "when an individual provides sworn testimony in multiple legal proceedings, it should be consistent to be believable." Appx21. In a stark and revealing contrast, the AJ completely ignores glaring, irreconcilable discrepancies between Dibbins's sworn testimony about whether she ever counseled Appellant

before her termination, a fact that goes to the very heart of what the Agency must prove by clear and convincing evidence. During the Agency's direct examination of Ms. Dibbins, she asserted that Ms. Raiszadeh required frequent counseling on an almost daily basis. Appx1667–1671. On cross examination, however, when confronted with her prior sworn EEO testimony, Dibbins admits that she never gave Appellant any verbal or written counseling prior to Appellant's receipt of her performance evaluation on December 28, 2007. Appx1709–1711.

Similarly, the AJ gives decisive weight to the Draft Notes consisting of unauthenticated, anonymous hearsay complaints purportedly compiled by an employee union representative, but completely ignores Dibbins's prior inconsistent sworn testimony that she had not received any complaints about Appellant. Appx1696. At the Hearing Dibbins sought to reconcile this prior inconsistent sworn testimony with her hearing testimony by nonsensically asserting that when she was asked in the prior EEO matter if she had received any complaints about Appellant and testified that she had not, she was "thinking of it about complaints about her, as a person, rather than how she functioned in the…work environment." Appx1697. Dibbins then admits that the complaints about Appellant in the Draft Notes were "about [Appellant] and how she was communicating with the employees." Appx1697. In fact, the Draft Notes, which Dibbins testified at the hearing she had seen in or around October 2007, are replete with complaints about Appellant "as a person.". Appx17–18. Dibbins's effort to explain away her prior sworn testimony that she never received any complaints about appellant "as a person" is incredible given the Agency's (and the AJ's) reliance on the October 11,

2007, Draft Notes. Finally, Dibbins's testimony that she "receive[d] the [Draft Notes] on or around October 11, 2007" (Appx1680), the very day it was prepared and four days before Knowles instructs his assistant Whitfield to circulate the Draft Notes "only" to the Clerical Unit employees (Appx1749), is inherently incredible.

In addition, the AJ ignores other gross inconsistencies in Susan Dibbins's hearing testimony on critical issues such as: (1) whether some of Appellant's subordinates disliked her because she was a poor manager, or whether they disliked her because she insisted that they follow the Agency's rules and policies (compare Appx1687–1689 with Appx1695); (2) whether the clerical unit became more effective, or less effective under Appellant's supervision (compare Appx1695 with Appx1663; Appx1676); (3) Dibbins's testimony that in 2007–08 she spoke with OIG "[s]ometimes daily…a couple of times a week at least", and her testimony that she first learned that Appellant complained to OIG about the open safe in "2011, maybe, 2012." (Compare Appx1662 with Apppx1683); and (4) whether the work in Appellant's unit was getting done or wasn't getting done. (Compare Appx1671 with Appx1695–1607).

The serious deficiencies in the AJ's finding that Bailey had no credibility and that her testimony should be disregarded entirely are discussed in Section III. B. above. In addition, the AJ held Bailey was "impeached for testifying inconsistently with her prior deposition testimony with regard to the February 11, 2008 memo written By Ms. Dibbins" (Appx23), but ignores prior inconsistent sworn testimony by Dibbins (see above), and disregards Bailey's undisputed testimony that Dibbins told her that the Agency terminated Appellant "because she used to work for

Michael Hadeed [an immigration attorney then under criminal investigation] and [Dibbins] did not know that before, [Appellant] never disclosed that to have before." Appx1599–1600). Dibbins's statement to Bailey is significant because it is undisputed that Dibbins was aware of Appellant's prior employment by Hadeed (Apppx1656–1660), and a false reason given by Dibbins for Appellant's termination is evidence of Agency reprisal.

Timothy Herlihy's testimony should be largely disregarded because he cannot dispute that Cheri Bailey and Ms. Raiszadeh met with him on November 21, 2007. Appx1808–1809 This was the reason the Agency claims it needed to take his testimony. Moreover, it is incredible that Herlihy claims not to recall the "safe issue" when that issue is prominently discussed in Ms. Raiszadeh's summary of her complaint provided to Mr. Herlihy on January 2, 2008. Compare Appx1804 with Appx316, Appx1821. These citations also discredit Herlihy's testimony that he does not recall Ms. Raiszadeh raising any issue concerning the Form G-514 even though that issue is listed prominently on the first page of Ms. Raiszadeh's January 2, 2008, summary of her complaint. Moreover, the AJ misstates Herlihy's testimony when she claims he said, "he did not receive a fax from the Appellant." Appx22. Herlihy's actual testimony was that it was "very unlikely" that he received a fax from Appellant." Compare Appx1825 with Appx22. The importance of this distinction is that the AJ uses the contradiction between this testimony of Herlilhy and Appellant's testimony that she sent a document by facsimile to him to discredit Appellant's general credibility. In so doing, however, the AJ ignores Appellant's proof that she sent a facsimile transmission to OIG around November

26 or 27, 2007, including her authentication of a note written in her handwriting containing a facsimile number corresponding to an OIG facsimile number, the initial "OIG", and the word "James," the first name of OIG agent James Izard. Appx1432–1435. Finally, Herlihy claims not to have spoken with Dibbins about Appellant's complaint, but he admits that Dibbins worked very closely with OIG on the ongoing Schofield in investigation, and his subordinate James Izzard was present in the CIS Fairfax facility on a frequent basis at that time. Compare Appx1807 with Appx1812–1813 ("I [Dibbins] was a confidential informant for the FBI, and I worked with the task force that was involved in the [Schofield] investigation.") Appx1658, Appx510-511.

Finally, the AJ disregards Mary Flores's testimony that "it was around the holidays, so it had to be November" when Bailey and Appellant went to OIG (Appx1633), finding that "it is undisputed that Ms. Flores did not personally attend the meeting with OIG, and her testimony is based on speculation that it was in November because of the holidays." Appx24. Inexplicably, in dismissing Flores's testimony, the AJ ignores corroborating testimony by Herlihy, a witness whose testimony she describes in another context as "forthright without dissimulation." Appx22. Although Herlihy cannot recall the date when he met with Appellant and Bailey, he admits to sending an email to Appellant on December 17, 2007, and that his meeting with them took place before that date. Appx1805; Appx315. Herlihy's testimony is consistent with that of Bailey, Flores, and appellant because "the holidays" could not have been Christmas holiday, and the only other holiday in the

November/December timeframe is Thanksgiving. November 21, 2007, the day both Appellant and Bailey testified was the date of their meeting with Herlihy, was the day before Thanksgiving.

> **2.   The AJ failed to apply the clear and convincing evidence standard to the facts of this case.**

When examining the strength of the Agency's evidence, the Board looks at the evidence the Agency had before it when it took the alleged retaliatory action. *Yunus v. Dep't of Veterans Affairs*, 242 F.3d 1367, 1372 (Fed. Cir. 2001); *Russell v. Dep't of Justice*, 76 M.S.P.R. at 326. If the agency fails to investigate a charge sufficiently before bringing an action, such a failure might indicate an improper motive. *Soc. Sec. Admin. v. Carr*, 78 M.S.P.R. 313, 335 (1998) aff d, 185 F. 3d 1318 (Fed. Cir. 1999).

The Agency has not presented evidence showing that it took similar actions against employees who were not whistleblowers but who were otherwise similarly situated to the Appellant. The AJ dismissed this failure on the part of Agency, quoting *Whitmore*, 680 F.3d at 1374, for the proposition that "the absence of any evidence relating to *Carr* factor three can effectively remove that factor from the analysis." Appx24, n.5. In so holding, the AJ has completely ignored Appellant's evidence that she was treated less favorably than several similarly situated mangers and other CIS employees who reported directly or indirectly to Dibbins, a lapse

that seems inexplicable given the time Appellant spent presenting this evidence at the hearing. As held by this Court in *Smith v. Gen. Servs. Admin.*, 930 F.3d 1359, 1361–62 (Fed. Cir. 2019):

> Without addressing evidence relevant to the agency's motive to retaliate or its treatment of other similarly situated non-whistleblowers – legal error in itself – the Board ruled that because the agency had introduced strong evidence of misconduct, removal was justified. In doing so, the Board conflated two distinct inquiries: whether the agency's penalty was reasonable and whether the agency would have imposed that same penalty *absent* Mr. Smith's protected whistleblowing. This was error.

Henry Barber was a similarly situated supervisor in Appellant's CIS building who reported directly to Dibbins. Appx1389–1390. On September 26, 2007, Barber sent an email to Greg Christian, Appellant's second-line supervisor, and Michael Knowles, union representative for Appellant's clerical subordinates, complaining that he had heard that Appellant "intentionally tried to run over one of the contractors…with her car." Appx1394. In this email, Barber calls Appellant "a threat to all employees in this building, including myself." Appx1395. Barber complains that he "was called on the carpet today by Susan Dibbins, FOD, for warning one of [Appellant's] employees to be careful when walking near this building." Appx1395. Dibbins told Barber that he "shouldn't be spreading rumors", but never disciplined him. Appx1395. Moreover, Dibbins admits that she never disciplined Barber, her immediate subordinate, for either this incident or for

warning other employees to be careful around Appellant because she is from Middle East, and people from that part of the world are dangerous. Appx1731–1733.

On February 11, 2008, Dibbins set an email to Berkenkemper stating her "need and want" to terminate Appellant in large part because she had allegedly told CIS employee Bailey that supervisor Tapia Katiuska "has been talking badly about her." Appx306, Dibbins's complete change in attitude and behavior toward Appellant after she made her OIG complaint is starkly revealed in her resuscitation of the Henry Barber slander that Appellant has intentionally tried to run a contractor down with her car in the DHS parking lot. According to Barber's e-mail, in September 2007, Dibbins admonished him for spreading this unfounded accusation and warning other employees to be careful around Appellant because she is from Middle East, and people from that part of the world are dangerous. Appx1731–1733. By early December, over two months after Appellant and Pat Raymond had brought the Barber slander and ethnic slurs to Dibbins's attention, Dibbins directed Appellant to report to the Investigator Tim O'Reilly to give a statement for an investigation in which *Appellant* had become the target. Appx1731–1735. Dibbins admits that after admonishing Barber in September for spreading a rumor about Appellant, by December the Appellant had become the target of an investigation over the very same incident. Appx1735. Dibbins's treatment of Barber and Appellant, similarly, situated supervisors, for essentially the same alleged infraction (spreading rumors about other employees), was vastly different, and should have been analyzed by the AJ as evidence relating to *Carr*

31

factor three (evidence showing that it took similar actions against employees who were not whistleblowers but who were otherwise similarly situated to the Appellant). Instead, the AJ disregarded the evidence.

In her email of November 28, 2007, in which Dibbins writes that she is "getting close to a decision to terminate [Appellant]," Dibbins cites as the first of five "incidents" supporting her position an email written by Appellant that she describes as "practically unintelligible." Appx335–338. In dismissing Appellant's argument that a single poorly drafted email was not a legitimate reason to terminate her employment, the AJ holds that "Ms. Dibbins [sic] assessment of the appellant's written work was also accurate [in that] [t]he email the appellant wrote on November 27, 2007, is nearly incomprehensible." Appx19. The AJ completely fails to address however, Appellant's argument that Katiuska Tapia, a similarly situated CIS supervisor on probationary status who like Appellant reported directly to Susan Dibbins, also had English language writing issues. Unlike Appellant, however, Tapia was afforded the opportunity to take English language writing courses. Appx1637, Appx1592–1593. ("[[Katiuska Tapia] told Appellant that [Dibbins] had put her in a writing class."). Dibbins did not provide Appellant with any opportunity to take a writing class. The Board's failure to even address the agency's treatment of Katiuska Tapia, a similarly situated CIS supervisor on probationary status who like Appellant reported directly to Susan Dibbins, is itself reversable evidence. *Smith v. Gen. Servs. Admin.*, 930 F.3d at 1361–62.

The Board has found under certain circumstances that an agency's failure to present evidence showing it took similar action against employees who were not

whistleblowers, but who were otherwise similar to an appellant, supports a finding that the agency failed to prove by clear and convincing evidence that it would have taken the same action against an appellant in the absence of the protected disclosure. *See, e.g., Chambers v. Dep't of the Interior*, 116 M.S.P.R. 17, ¶ 70 (2011). In the instant case, Appellant has presented evidence that the Agency treated similarly situated managers who were not whistleblowers more favorably, the Agency failed to rebut this evidence, and the AJ disregarded it in her initial Decision.

Until at least November 9, 2007, Susan Dibbins and the Agency gave unqualified support to Appellant concerning the problems caused by Appellant's insubordinate and hostile subordinates. See the November 9, 2007, memorandum, Appx111–112, Appx1492. Dibbins admits that she agrees with everything in the November 9, 2007, memorandum, Appx1712. On November 21, 2007, Appellant made her complaint to OIG, and by November 28, 2007, Dibbins had gone from supporting Appellant to "getting close to a decision to terminate the Appellant." Appx274–276, Appx1684.

Dibbins admits that before giving her an adverse evaluation in December 2007, there is no written document reflecting any counseling of Ms. Raiszadeh concerning any problem with her performance, either verbally or in writing. Appx1709–1711. In fact, on November 28, 2007, in response to Dibbins's assertion that she was moving toward a decision to terminate Ms. Raiszadeh, Berkenkemper's overriding concern was still the focus group mediation and efforts to counsel and discipline Appellant's subordinates, not Appellant. In Dibbins's

November 30, 2007, email reply to Berkenkemper's response to her, Dibbins appears to back down from her intention to terminate Ms. Raiszadeh in response Berkenkemper's reaction in which he maintains the concentration on Ms. Raiszadeh's insubordinate employees. Ultimately, it was Dibbins who, in effect, cancelled the focus group mediation after seemingly agreeing with Berkenkemper that her decision about Ms. Raiszadeh should be contingent on the outcome of the focus group mediation. Appx339–344 tracks the reschedule of the focus group mediation from September 25, 2007, through January 25, 2008, through the cancellation of the mediation when Dibbins terminated Ms. Raiszadeh's employment on February 19, 2008. For example, in his January 25, 2008, email, Appx277-282. Gregory Christian, Ms. Raiszadeh's second line supervisor, writes: "While I'm not happy about it, I'm going to delay the start of mediation. I want you to know, however, that my frustration stems from the fact that it's been 11 weeks since we had the Nov. 9 meeting.…" The emails comprising Appx339–344 reveal the falsity of the Agency's contention at the February 27 hearing that the Nov. 9, 2007, town hall meeting was the focus group mediation. The focus group mediation never took place.

The reasons given by Dibbins for her abrupt decision to terminate Ms. Raiszadeh are trivial and incredible. First, Dibbins claims that Ms. Raiszadeh sent an unintelligible e-mail message describing one of her subordinates' statements to her "this is bullshit" in response to the Ms. Raiszadeh's question regarding the employee playing video games on her computer at work. Appx1716. Dibbins admits that Ms. Raiszadeh's subordinate was using profanity to a supervisor, one of

the specifically proscribed behaviors that the Clerical Unit employees had been warned about a few weeks earlier in the November 9, 2007, memorandum. Appx1717. Dibbins did nothing to discipline the offending employee, Sandra Bartley, but cited this incident as one of five reasons she was "getting very close to a decision to terminate" Ms. Raiszadeh. Appx1718.

The trivial nature of Dibbins's reasons is further revealed by her description of the second "incident" which caused her to decide that she was "getting close to" a decision to terminate Ms. Raiszadeh. Dibbins says Ms. Raiszadeh asked another employee, an older woman, for a hug to show other employees that things were OK between Amanda and this employee. Appx1718–1719. Dibbins admits that this alleged "hugging" incident did not violate any policy or rule the agency maintains. Appx1719. Dibbins also admits that the "hugged" employee who was the subject of this alleged "incident" never made any complaint about it. Appx1719–1720. But incredibly, according to Dibbins this showed a "lack of judgment" on Ms. Raiszadeh' part.

The context for the next "incident," incident 3, goes to the heart of Ms. Raiszadeh's retaliation claim: Ms. Raiszadeh's comment about Tony Smith related to an incident where Smith's unit mailed an N-600 form for naturalization of a child of naturalized parents. The address to which the N-600 was mailed was not a good address, the N-600 was returned to Smith's unit, but the N-600 was lost, missing, or stolen at the Washington District office. Dibbins admits that whatever she was accusing Ms. Raiszadeh of doing or not doing with regard to this "incident," she never violated any Agency rule or policy. Appx1719.

Incident 4 relied upon by Dibbins as a reason for "getting close to a decision to terminate Amanda" is both trivial and false. Carla Martino, a Supervisory Information Officer, allegedly told Dibbins that Ms. Raiszedeh saw her on the elevator and said "Oh, I like your hair, it looks nappy." Ms. Raiszsedah denied making the statement, denied even knowing the meaning of the work "nappy," and Dibbins, although she states in her November 28, 2007, e-mail (Appx274–276), "Carla's demeanor when speaking with me about the incident was pretty genuine", later, stated that she had no idea who was telling the truth about the incident. Appx1721. (" No. I wasn't – that—that wasn't my – at the time when I talked about it with them, that wasn't my intent to figure out who was lying or who was telling the truth."). It is incredible that Dibbins was "getting close to a decision to terminate" Ms. Raiszadeh over an "incident" which she wasn't even sure had happened!

Finally, Dibbins cites as a reason for "getting very close to a decision to terminate Amanda" the alleged report of Ms. Raiszadeh's subordinate, Joyce Irby that Ms. Raiszadeh made the statement "I do not care who you are what your title is, if you make me mad, I am going to get back at you. I do not care if you are Susan or Greg." Appx274–276. In the very November 28, 2007, e-mail in which Dibbins cites this "incident" as a reason she is "getting very close to a decision to terminate Amanda," Dibbins admits "I have no way to [sic] telling whether this is true or not." Joyce [Irby] has certainly had problems with Amanda." Appx1724–1727. This "incident" is an utterly incredible reason for the termination of Ms. Raiszadeh's employment.

The first notice of deficient performance received by Ms. Raiszadeh was her evaluation dated December 28, 2007. Ms. Raiszadeh received three "zero" ratings in the areas of "communication", "Teamwork" and Cooperation", and "Leadership". Regarding the communication element, Ms. Raiszadeh had never been counseled or warned that her communications skills were in any way deficient. Significantly, the only written communication considered by Susan Dibbins in giving Ms. Raiszadeh a "zero" on communication was the informal assessment cited by Dibbins in her November 28 email (Appx274–276). Appx1705–1706. Dibbins never offered to send Ms. Raiszadeh to a writing, course, even though a fellow Supervisor, Katinska Tapia, a similarly situated supervisor reporting to Dibbins, who like Amanda was on a probationary status, took a writing proficiency course that was offered to her. Appx1592–1593, Appx1637–1640.

The reasons given by Dibbins for the "zero" ratings in "Teamwork and Cooperation" and in "Leadership" are false, ignore the problems that existed in the Clerical Unit well before Ms. Raiszadeh became a supervisor, and rely on an alleged management intervention involving a "Focus Group" that never even took place. Dibbins's statements in her explanation of these zero ratings is that Appellant's "unit experienced a significant disintegration of cohesion that management entered into a Focus Group with the Union and Labor Relations to identify and solve any existing problems" ("Teamwork and Cooperation") and "Management's need for intervention through the Focus Group exemplifies Ms.

Raiszadeh's need to concentrate on developing others and fostering an environment that encourages positive teamwork" ("Leadership") are completely disingenuous. Dibbins admitted at trial that the Focus Group never took place.

Carroll: "Had you well, the record is clear that there had been discussion about having a mediation/focus group from at least as early as September of 2007. Do you recall that?

Dibbins: Yes

Carroll: Why did the mediation never take place?

Dibbins: It was postponed for a variety of reasons. I wasn't really involved in setting up the timing. That was really between Greg Christian, who was the District Director, and them Mitch Berkenkemper, who was in Labor Relations. So, I'm not exactly sure what all the postponements were about. Appx541

The Focus Group, as shown by the November 9, 2007, memorandum, was intended by Dibbins and Management as a vehicle through which management could support Ms. Raiszadeh in her efforts to clean up a very troubled unit. After Ms. Raiszadeh told Dibbins on November 26 or 27 that she had already reported the safe issue to OIG, Dibbins postponed and ultimately cancelled the Focus Group, which never took place. Dibbins gave Ms. Raiszadeh two "zero" ratings allegedly because of the need for a Focus Group which she cancelled, and which never took place. Appx1489–1490, Appx339–344.

Significantly, the AJ's Initial Decision concluding that the Agency proved by clear and convincing evidence that it would have terminated Appellant's employment even in the absence of her protected disclosure is erroneously

premised on the occurrence of a "Focus Group" meeting that never took place. At Appx21 of the of her Initial Decision the AJ states: "After the Focus Group report was issued on October 11, 2007, management officials discussed techniques to correct the appellant's behavior while continuing to support her as a supervisor." The AJ has confused the Appellant's aborted Focus Group meeting intended to mediate conflicts between Appellant and her very difficult subordinates, a Focus Group meeting that was canceled and never took place, with a meeting between Appellant's subordinates and their union representative Michael Knowles which resulted in the generation by union representative Knowles of "Draft Focus Group Meeting Notes" dated October 11, 2007, an unauthenticated hearsay document which was not produced by the Agency until the trial of this matter and which reflects an alleged union meeting at which neither Appellant nor any management official was present. The AJ's conflation of these two distinct meetings, the union meeting with Appellant's subordinates and the "Mediation/Focus Group" which never took place, is clear from Dibbins's description of the Focus Group in her "0" ratings in the "Teamwork and Cooperation" and "Leadership" categories of Appellant's performance evaluation. In both of those categories Dibbins describes the "Focus Group" as a "management" Focus Group, clearly referring to the "Focus Group/Mediation" that never took place, not the union meeting between union representative Knowles and Appellant's subordinates, a meeting that was not a "mediation" because neither Appellant nor any other management official even attended. Appx1863.

The utter insufficiency and weakness of Dibbins's reason for terminating Ms.
Raiszadeh's employment are confirmed by the testimony of Mitch Berkenkamper,
the Labor Employee Relations Specialist whose role was to advise Dibbins and
other managers about discipline and termination matters, who testified that Dibbins
may not have given Ms. Raiszadeh a chance given the problems that existed in the
clerical unit well before Ms. Raiszadeh became the supervisor of that unit.
Appx1484–1485.

Perhaps the most unambiguous evidence that Dibbins's reasons for terminating
Ms. Raiszadeh are false and a pretext for reprisal are the reasons given in her
February 11, 2008, memorandum. Exhibit "D." Dibbins's assertion that Cheri
Bailey told Dibbins that Ms. Raiszadeh had told her that Ms. Tapia, another
supervisor, was out to get Bailey, is fabricated and utterly false. Cheri Bailey
expressly denied ever making such a report to Dibbins. Appx1699–1702.
Moreover, another claim made in Dibbins's February 11, 2008, memorandum is
that after a closed-door meeting between Bailey and Dibbins, Ms. Raiszadeh
approached Bailey and inquired about the subject of the meeting. According to
Cheri Bailey's sworn testimony, this never happened, and she never made any such
report to Dibbins. Appx1699–1702. Cheri Bailey has also denied that she ever told
Dibbins that she had caught Ms. Raiszadeh in several lies or that Ms. Raiszadeh
needed to be the center of attention. Cheri Bailey also denied the statement in
Dibbins' February 11 memorandum that Ms. Raiszadeh had been telling her and
other people that she is a "star witness" for a case against her former employer,
Attorney Michael Hadeed. In fact, Dibbins lied to Cheri Bailey about the reasons

for Ms. Rezazadeh's termination, telling her that Ms. Raiszadeh was terminated because she had failed to reveal her prior employment with Hadeed. Appx1597–1600. This was never a reason given by Dibbins for Ms. Raiszadeh's termination, and in fact Ms. Raiszadeh made full disclosure about her employment by Hadeed in her pre-employment application. Appx1657. Indeed, Appellant gave unrebutted testimony that Dibbins specifically asked her during her pre-employment interview whether her prior employment with Hadeed presented any conflict of interest.

On February 19, 2008, Dibbins terminated Ms. Raiszadeh's employment. Dibbins and Greg Christian fraudulently induced her to submit a resignation later, telling her that by "resigning" she could preserve her eligibility for future employment with the federal government. The testimony of Greg Christian shows that this false statement was made with the intent of inducing Ms. Raiszadeh to resign, thereby precluding a whistleblower appeal like the present case. The fraudulent context of the promises of Dibbins and Christian were revealed when Ms. Raiszadeh actually obtained a new federal job with DHS that was contingent on Ms. Raiszadeh passing a background check and Dibbins caused Ms. Raiszadeh to lose this job by telling the federal investigator that she had not resigned but had been fired. This was Dibbins' final act of reprisal for Ms. Raiszadeh's November 21, 2007, complaint to the OIG concerning the open safe.

**E.  New and Material Evidence regarding the October 11, 2007, Focus Group Meeting notes not available when the record was closed establishes that the Agency did not secure a copy of this document until over a year after Appellant's testimony.**

5 C.F.R. § 1201.115(d) provides that the Board may grant a petition for review upon a showing that new and material evidence is available when the record closed. Appellant submits the following new and material evidence:

1. Kenneth Ward ROI Report (regarding the source of the Knowles Draft Notes) Appx1778–1788,

2. Affidavit of Mitch Berkenkemper (Agency management neither saw nor relied upon Draft Notes in deciding to terminate Appellant)Appx1789–1790,

3. Declaration of Thomas F. Hennessy (regarding discrepancy in Appellant's testimony as to exactly when she complained to OIG) Appx1791–1993, and

4. Transcribed testimony of Timothy Herlihy (testimony filed in record as audio disks) Appx1794–1828.

## VI.   CONCLUSION AND RELIEF SOUGHT

For all the foregoing reasons, Appellant respectfully requests that this Court reverse the Board's July 23, 2023 Final Order and remand this case to the Board for determination of Appellant's damages.

<div style="margin-left:50%">

The Hennessy Law Firm

Respectfully submitted,

</div>

Dated: April 29, 2024          By:  /s/ Tom Hennessy
_____

Thomas F. Hennessy

Thomas F. Hennessy

The Hennessy Law Firm
4015 Chain Bridge Rd, Suite G
Fairfax, Va 22030
(703) 865-8836
(703)865-7633 Fax
thennessy@virginiawage.net

# ADDENDUM

## **TABLE OF CONTENTS**

| Exhibit | Description | Date | ECF No. | Vol. | Page |
|---------|-------------|------|---------|------|------|
| 01 | Final Order | 07/20/2023 | | 1 | Appx 1 |
| 02 | Initial Decision | 11/23/2016 | 3 | 1 | Appx 8 |
| 03 | Remand Order | 12/09/2015 | 3 | 1 | Appx 32 |
| 04 | Initial Decision | 01/27/2015 | 3 | 1 | Appx 42 |

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

| | |
|---|---|
| AMANDA MOJDEH RAISZADEH,<br>          Appellant, | DOCKET NUMBER<br>DC-1221-12-0452-B-1 |
| v. | |
| DEPARTMENT OF HOMELAND<br>  SECURITY,<br>          Agency. | DATE: July 20, 2023 |

## THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Thomas F. Hennessy, Esquire, Fairfax, Virginia, for the appellant.

Laura J. Carroll, South Burlington, Vermont, for the agency.

**BEFORE**

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member

**FINAL ORDER**

¶1      The appellant has filed a petition for review of the initial decision, which denied her request for corrective action in this individual right of action appeal. On petition for review, the appellant argues that the administrative judge erred in finding that the agency proved by clear and convincing evidence that it would

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. See 5 C.F.R. § 1201.117(c).

**Appx1**

have terminated the appellant in the absence of her protected disclosures. Generally, we grant petitions such as this one only in the following circumstances: the initial decision contains erroneous findings of material fact; the initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case; the administrative judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case; or new and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115). After fully considering the filings in this appeal, we conclude that the petitioner has not established any basis under section 1201.115 for granting the petition for review. Therefore, we DENY the petition for review and AFFIRM the initial decision, which is now the Board's final decision. 5 C.F.R. § 1201.113(b).[2]

### NOTICE OF APPEAL RIGHTS[3]

You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their

---

[2] We have considered the appellant's arguments regarding the administrative judge's consideration of hearsay and the admission of documentary evidence. Petition for Review File, Tab 5 at 2-7, 9. We find that those arguments do not provide a basis for reversing the initial decision.

[3] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

**Appx2**

jurisdiction. If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

(1) **Judicial review in general**. As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date of issuance of this decision. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The

**Appx3**

4

Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

(2) **Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after you receive</u> this decision. <u>5 U.S.C. § 7703</u>(b)(2); *see Perry v. Merit Systems Protection Board*, <u>582 U.S. 420</u> (2017). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** <u>after your representative</u> receives this decision. If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* <u>42 U.S.C. § 2000e-5</u>(f) and <u>29 U.S.C. § 794a</u>.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding all other issues</u>. <u>5 U.S.C. § 7702</u>(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** <u>after you receive</u> this decision. <u>5 U.S.C. § 7702</u>(b)(1). If you have a representative in this case, and your representative receives this decision before you do, then you must file

**Appx4**

with the EEOC no later than **30 calendar days** after your representative receives this decision.

    If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

> Office of Federal Operations
> Equal Employment Opportunity Commission
> P.O. Box 77960
> Washington, D.C.  20013

    If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

> Office of Federal Operations
> Equal Employment Opportunity Commission
> 131 M Street, N.E.
> Suite 5SW12G
> Washington, D.C.  20507

    **(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**. This option applies to you only if you have raised  claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[4]  The court of appeals must receive your petition for

---

[4] The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017. The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction. The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

**Appx5**

6

review within **60 days** of the <u>date of issuance</u> of this decision.    <u>5 U.S.C.</u>
<u>§ 7703</u>(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for
the Federal Circuit, you must submit your petition to the court at the
following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal
Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular
relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is
contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to
the U.S. Court of Appeals for the Federal Circuit, you may visit our website at
http://www.mspb.gov/probono for information regarding pro bono representation
for Merit Systems Protection Board appellants before the Federal Circuit.  The
Board neither endorses the services provided by any attorney nor warrants that
any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their
respective websites, which can be accessed through the link below:

> http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

FOR THE BOARD:                    /s/ for
                                  _____
                                  Jennifer Everling
                                  Acting Clerk of the Board
Washington, D.C.

**Appx6**

CERTIFICATE OF SERVICE

I certify that this Order was sent today to each of the following:

Electronic Mail          Thomas F. Hennessy, Esq.
                         The Hennessy Law Firm
                         4015 Chain Bridge Road, Suite G
                         Fairfax, VA 22030

U.S. Mail                Amanda Mojdeh Raiszadeh
                         5973 Havener House Way
                         Centreville, VA 20120

Electronic Mail          Laura J. Carroll
                         Department of Homeland Security
                         USCIS; U.S. Department of Homeland Security
                         70 Kimball Avenue, Room 103
                         South Burlington, VT 05403

| July 20, 2023 | /s/ |
|---|---|
| (Date) | Tawanda Williams |
| | Paralegal Specialist |

**Appx7**

## UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
## ATLANTA REGIONAL OFFICE

| | |
|---|---|
| AMANDA MOJDEH RAISZADEH,<br>Appellant, | DOCKET NUMBER<br>DC-1221-12-0452-B-1 |
| v. | |
| DEPARTMENT OF HOMELAND<br>SECURITY,<br>Agency. | DATE: November 23, 2016 |

Thomas F. Hennessy, Fairfax, Virginia, for the appellant.

Laura J. Carroll, South Burlington, Vermont, for the agency.

**BEFORE**
Sherry Linville
Administrative Judge

### INITIAL DECISION

By Order dated December 9, 2015, the Board remanded this appeal to address whether the agency would have taken the same actions against the appellant absent her protected disclosure. Remand File (RF), Tab 1. For the reasons explained below, the appellant's request for corrective action is DENIED.

### ANALYSIS AND FINDINGS

Background

Effective March 18, 2007, the agency appointed the appellant to the position of Citizen and Immigration Services (CIS) Assistant, GS-1802-07, which was later converted to the position of Supervisory CIS Assistant, GS-1802-09, on April 1, 2007. Appeal File, Docket No. DC-0752-12-0648-I-2, (AF-I-2) Tab 18

**Appx8**

2

at 12-13. The appellant had no prior experience working for the federal government and was required to complete a probationary period of one year. *Id.* In her new position, the appellant supervised approximately seven to eight clerical/support employees of the CIS Washington Field Office in Fairfax, Virginia. *Id.* at 23-31, 45. The appellant's immediate supervisor was Susan Dibbins who was the Field Office Director, GS-15. Hearing Transcript (HT), Vol. 2 at 134-35.

In late 2007, the appellant and a coworker, Cheri Bailey, met with the Special Agent in Charge, Joseph Gaudiano, and the Assistant Special Agent in Charge, Timothy Herlihy, with the agency's Office of Inspector General (OIG). AF-1-2, Tab 30, Exhibit I; Tab 42, Hearing Compact Disc (HCD). During this meeting, the appellant complained of several incidents involving her subordinate employees, and that on June 7, 2007, a safe was left open containing naturalization certificates.[1] *Id.* On December 17, 2007, Agent Herlihy sent the appellant an email, in which he told her it was "nice meeting with" her and that he was returning her files. *Id.*, Exhibit H. In that email, Agent Herlihy also thanked the appellant "for taking time to pull [her] thoughts together," and that he was looking "forward to hearing" from the appellant. *Id.* On January 2, 2008, the appellant sent Agent Herlihy a letter outlining her complaints. *Id.*, Exhibit I.

On December 28, 2007, Ms. Dibbins rated the appellant as unacceptable on three of her Core Competencies (communication, teamwork and cooperation, and leadership) resulting in an overall performance rating of unacceptable. AF-I-2, Tab 19 at 6-16. The appellant electronically signed the performance evaluation on January 11, 2008. *Id.* On February 11, 2008, Ms. Dibbins sent an email to

---

[1] Although in her closing argument the appellant references the safe containing naturalization certificates being left open on two occasions and in her testimony she states that the safe was left open multiple times, only the June 7, 2007 incident was brought to OSC and is properly before the Board. AF-2-I, Tab 26 (Order and Summary of Prehearing Conference); *see also,* RF, Tab 1 (Board Remand Order).

**Appx9**

3

Mitch Berkenkemper, Chief of the Labor and Employees Relations, stating that she wanted to terminate the appellant because "[s]ome events happened last week that were the final straw and she cannot continue in a supervisory role here any longer." AF-1-2, Tab 30, Exhibit D. On February 19, 2008, Ms. Dibbins issued the appellant her termination notice, which cited deficiencies in her performance during her probationary period. AF-1-2, Tab 18 at 46-47. While the termination letter effectuated the appellant's termination on February 19th, the agency permitted the appellant to submit her resignation on February 29, 2008, retroactive to the termination date. *Id.* at 50.

Clear and Convincing Evidence

    For an appellant who establishes Board jurisdiction over her IRA appeal to be entitled to corrective action over her claims, she must establish by a preponderance of the evidence the following four elements: (1) the management official has the authority to take, recommend, or approve any personnel action; (2) the aggrieved employee made a disclosure protected under 5 U.S.C. § 2302(b)(8)(A); (3) the management official used her authority to take, or refuse to take, a personnel action against the aggrieved employee; and (4) the protected disclosure was a contributing factor in the agency's personnel action. *See Chambers v. Department of Interior*, 602 F.3d 1370, 1376 (Fed. Cir. 2010); *Lachance v. White*, 174 F.3d 1378, 1380 (Fed. Cir. 1999), *cert. denied*, 528 U.S. 1153 (2000). If the appellant meets that burden, the Board must order corrective action unless the agency establishes by clear and convincing evidence that it would have taken the same personnel action in the absence of the disclosure. *Whitmore v. Department of Labor*, 680 F.3d 1353, 1368 (Fed. Cir. 2012).

    It is undisputed that the appellant was hired by the agency to supervise the clerical/support staff for the CIS Washington D.C. Field Office, some of which had been with the agency 20 to 30 years. By all accounts, there were continuing problems between the appellant and her staff. In August 2007, two of the appellant's subordinate employees complained that the appellant subjected them

**Appx10**

4

to a hostile work environment. AF-I-2, Tab 18 at 16, 18-21. Specifically, the employees complained that while the appellant was away at training, she called the unit excessively, screamed at the employees, threatened unwarranted disciplinary action, and treated them with disrespect. *Id.* These problems continued, necessitating management and the American Federation of Government Employees (AFGE) to agree to conduct a Focus Group with the employees in October 2007. *Id.* at 23-31; Tab 31, Exhibit L.

After the Focus Group report was issued on October 11, 2007, management officials discussed techniques to correct the appellant's behavior while continuing to support her as a supervisor. *Id.* at 43-45. On November 9, 2007, Gregory Christian, District Director, issued the clerical unit employees a memo to serve "as a reminder of policies and behaviors that are critical to the smooth operation of the Clerical Unit and the Washington Field Office" and the memo also stated "[i]t is imperative that all employees abide by these practices." AF-I-2, Tab 19 at 4-5. Among other things, this memo reminded the clerical employees that they were to "obey the directive of their supervisors," not perform work for another unit without permission, "behave professionally in the office and to refrain from using profanity," and to "show proper respect for their supervisor's position, regardless of their opinion of the person in the position." *Id.*

On November 28, 2007, Mr. Berkenkemper sent an email to several management officials, including the appellant and her supervisor, Susan Dibbins, suggesting a two prong approach to improve the relations in the appellant's clerical unit. AF-I-2, Tab 18 at 32-35. The first approach was to deal with the appellant's shortcomings by conducting a mediation with the appellant and her staff, and the second involved potential disciplinary action if the appellant's employees violated the procedures provided in the November 9th memorandum. *Id.* That same day, Ms. Dibbins sent Mr. Berkenkemper an email in which she explained that she was "getting close to a decision to terminate [the appellant]" because she did not have "the ability or temperament to be a supervisor." *Id.*

**Appx11**

However, later that day, Ms. Dibbins confirmed that she would "hold-off on any final decision regarding [the appellant] while we get this next phase going," and that while she still had "some serious reservations about [the appellant's] ability to lead," she wanted "to see how [the appellant] handle[d] herself and the unit during this phase of the process." *Id.* Ms. Dibbins also noted that she wanted to start the mediation process "soon while [the appellant] is within her probationary period," but "time is running short." *Id.* Because of various scheduling issues, the mediation was not scheduled until February 19 and 21, 2008. AF-I-2, Tab 31, Exhibit L.

On December 28, 2007, Ms. Dibbins rated the appellant as unacceptable in the core competencies of communication, teamwork and cooperation, and leadership. AF-1-2, Tab 19 at 6-16. On February 11, 2008, Ms. Dibbins wrote a memo for record, outlining a report she received from an employee, Cheri Bailey. AF-1-2, Tab 31, Exhibit D. The memo indicated that the appellant had been telling Ms. Bailey that Katinska Tapia, Ms. Bailey's supervisor, had been "talking badly about" Ms. Bailey and that "she is really after you." *Id.* The memo also indicated that the appellant had asked about the content of a closed-door meeting between Ms. Bailey and Ms. Dibbins, and that she had been telling everyone that she was the "star witness" in the Michael Hadeed investigation.[2] *Id.* Ms. Dibbins noted that while the Hadeed investigation was "confidential," the appellant had told at least four other employees. *Id.* The memo further indicated that Ms. Dibbins spoke to another employee, Mary Flores, for confirmation of the report, and that Ms. Flores stated that the appellant was "very immature, cannot be trusted, and [tries] to stir-up problems because she constantly needs to be the center of attention." *Id.* Ms. Dibbins concluded the

---

[2] The OIG had an ongoing criminal investigation of Michael Hadeed, a local attorney. The appellant worked as a paralegal for Mr. Hadeed prior to her appointment to the federal service.

**Appx12**

6

memo by stating "based on this information, combined with other incidents with Amanda in the past, I am seeking to terminate her while she is on probation." *Id.* That same day, Ms. Dibbins emailed Mr. Berdenkemper stating that she "need[s] and want[s] to terminate Amanda Raiszadeh," and that "[s]ome events happened last week that were the final straw and she cannot continue in a supervisory role here any longer." *Id.*, Exhibit D. On February 19, 2008, Ms. Dibbins notified the appellant that she "will be removed during probation from [her] positon of Supervisory CIS Assistant" based on her unsatisfactory performance rating. AF-1-2, Tab 19 at 46-47.

At the hearing, Ms. Dibbins testified that the appellant "was not particularly competent as a supervisor," and that she had "difficulty making independent decisions," tended "to be overly dramatic about things that were going on in the office," and was inclined "to personalize things that really were more about...operational issues." HT, Vol. 2 at 141. She explained that sometimes the appellant demonstrated good judgment and sometimes she did not, and she required a lot of "hand-holding" with "how to deal with employees individually; how to deal with...dynamics within the group," and "operational issues." *Id.* at 142. Ms. Dibbins stated that she spoke to the appellant several times a week on how to improve the office functions, during which she would "point out" the appellant's "problem areas." *Id.* at 148. While Ms. Dibbins acknowledged that the appellant had a "difficult staff," she testified that she "couldn't always be the problem solver" for the appellant, and because the appellant was "hired to be a member of management," she was "supposed to be able to make independent decisions." *Id.* at 149. Ms. Dibbins testified that she was not aware that the appellant had gone to the OIG to report the safe being left open until 2011 or 2012, during the processing of the appellant's EEO complaint. *Id.* at 161. She testified that while she was aware that the appellant had met with the OIG in 2007, it was her belief that the meetings involved an investigation of Michael Hadeed, the appellant's former employer. *Id.* Regarding the

**Appx13**

7

unacceptable performance ratings, Ms. Dibbins testified that she gave these ratings to the appellant based on her performance, not because she had met with the OIG. *Id.* at 185.

Mr. Christian testified that he received reports "from [the appellant's] direct staff...that she was accusative and harsh with her employees and there was often a back and forth between her and her employees, and it was a difficult environment to work in." HT, Vol. 2 at 94. He stated that the appellant "was a contributing factor" to the drama in her office. *Id.* at 95. While the decision to terminate the appellant was Ms. Dibbins', Mr. Christian testified that he agreed with the decision. *Id.* at 100.

Mr. Berkenkemper testified that the appellant had "a difficult working environment in the sense that what you had was a group of employees in an office who had worked together for many years, some of them as many as 30 years together," and they were "familiar with each other" and "a close-knit group." HT, Vol. 2 at 152. He also testified that the planned mediation session could not be scheduled in November/December 2007 because of the holiday schedule, and once Ms. Dibbins decided to terminate the appellant, it was unnecessary to have the mediation scheduled for February 19 and 21. *Id.* at 167.

The appellant testified that she was hired to supervise the clerical unit, which had between seven and nine employees. HT, Vol. 1 at 14-15. At the beginning, she was told that she was "inheriting a very hostile unit" of employees. *Id.* The appellant testified that the behaviors outlined in the November 9 memo were problems that she had brought to management's attention, and when this memo was issued, the appellant believed that she had the support of Ms. Dibbins and Mr. Christian. *Id.* at 23. According to the appellant, Ms. Dibbins would always listen to her and allow her to talk at supervisor meetings, but this "drastically" changed after November 27, 2007. *Id.* at 50.

The appellant stated that she initially called James Izzard with the OIG, and after speaking with her, he set up a meeting with his supervisor, Tim Herlihy.

**Appx14**

8

*Id.* at 86-89. The appellant testified that she is sure that the meeting occurred on November 21, 2007, the day before Thanksgiving, because she purchased Super Chicken for her employees on that day with her NASA credit card. *Id.* The appellant further testified that she believes she met with the OIG on November 21 because she and Ms. Bailey were provided 2 hours of administrative leave on that date, and that was the only date they could go together. *Id.* at 92-95. She testified that they met with the agents until 6:00 or 6:30 that evening. *Id.* at 99. After the meeting, the appellant stated that she spent her Thanksgiving holiday putting together all her thoughts on a written document and faxed it to Mr. Herlihy on November 26 or 27. *Id.* at 111. The appellant further testified that after she faxed this document to Mr. Herlihy, she and Ms. Dibbins had an "extreme confrontation" on November 26 or 27, where Ms. Dibbins "started interrogating" her about what she told the OIG. *Id.* at 112-15. The appellant explained that Ms. Dibbins was very upset and yelling. *Id.* The appellant testified that she called Mr. Herlihy shortly thereafter, during which they had a lengthy conversation about the confrontation with Ms. Dibbins and her belief that she was going to be fired for coming to his office. *Id.* She confirmed that Mr. Herlihy emailed her on December 17, 2007, and she said that he verbally informed her that she needed to put her complaints in better written form. *Id.* at 117; Tab 31, Exhibit H. She also confirmed that she sent him the list of complaints on January 2, 2008, after receiving assistance with the writing from Ms. Bailey. *Id.*; Tab 31, Exhibit I.

Prior to the poor performance evaluation in late December 2007, the appellant testified that she had not received any formal counseling from her supervisors and no indication that she might be subject to termination. HT. Vol. 1 at 127-31. She stated that throughout her employment she had been given additional responsibilities from Ms. Dibbins. Further, she disputed several of the incidents as provided in Ms. Dibbins' November 28, 2007 email. *Id.* at 133-41. The appellant also testified that she never made the comments to Ms. Bailey and

**Appx15**

Ms. Flores as indicated in Ms. Dibbins' February 11, 2008 memorandum. *Id.* at 188.

Agent Herlihy testified that he and Agent Gaudiano met with the appellant and Ms. Bailey because Agent Izzard and Agent Karen Jordan were unable to meet with them. AF-I-2, Tab 42. He explained that Ms. Bailey had been providing information concerning several pending criminal investigations, and that the appellant was being interviewed to determine whether she had information pertaining to the Michael Hadeed investigation. *Id.* As it turns out, the appellant had no valuable information about the Hadeed investigation and wanted to discuss various personnel problems she was having with her employees and managers. *Id.* While Agent Herlihy recalled the appellant reporting the safe incident, he stated that they were well aware of safes being left open at CIS and that was not noteworthy. *Id.* He also confirmed that he sent the appellant the email on December 17, 2007. *Id.*

Ms. Bailey testified that she remembered going with the appellant "a couple of days before the Thanksgiving holiday," and that she believes it was November 21. HT, Vol. 1 at 50-51. She testified that she would have left the office around 2:30 p.m., and they met with the agents until after dark. *Id.* at 52. Ms. Bailey confirmed that the appellant spent her Thanksgiving holiday writing a document for the OIG. *Id.* at 56. Ms. Bailey further testified that not long after this visit, Ms. Dibbins asked her about the appellant's visit to the OIG and that Ms. Dibbins was trying to figure out who went with her to the OIG and details about the visit. *Id.* at 61-64. According to Ms. Bailey, Ms. Dibbins told her that the appellant had informed her of the OIG visit. Ms. Bailey also denied making the report to Ms. Dibbins as provided in the February 11, 2008 memorandum and explained that Ms. Dibbins told her that the appellant had been bragging about being a "star witness" in the Hadeed investigation. *Id.* at 72-74, 76. After the appellant's termination, Ms. Bailey testified that Ms. Dibbins informed her that

**Appx16**

. 10

the appellant had been terminated for her failure to disclose that she had worked for Michael Hadeed and told her not to talk to the appellant. *Id.* at 78.

Clear and convincing evidence is that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established. 5 C.F.R. § 1209.4(e). In determining whether an agency has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of whistleblowing, the Board will consider the following factors: the strength of the agency's evidence in support of its action; the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated. *Carr v. Social Security Administration,* 185 F.3d 1318, 1323 (Fed. Cir. 1999). "Evidence only clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record, and despite the evidence that fairly detracts from that conclusion." *Whitmore,* 680 F.3d at 1368.

*The agency's evidence in support of its action is strong.*

The agency had strong evidence to support the termination of a probationary employee. There is no denying the evidence that the appellant was having serious difficulty managing her staff. As reported by the AFGE Focus Group, "the 'elephant in the room' during the meeting was the fact that the employees feel strongly that the main problem has been poor supervision, divisive policies and a hostile work environment created by their supervisor, Ms. Raiszadeh." AF-I-2, Tab 18 at 23-31. Some of the criticisms included:

- The employees "feel that they are constantly nagged and provoked by" the appellant;
- The appellant had "control issues" that requires her to "constantly reinforce and remind the workers" that she was "in charge" in a way that was "abrasive, overbearing and rude;"

**Appx17**

- She "micro-manages" the unit;
- She "constantly threatens" the employees with disciplinary action;
- The appellant would call the employees while they were on leave and rudely spoke to their family;
- She "berates employees for going outside of their chain of command to address issues;"
- The appellant would discuss the employees' "deficiencies and failings in front of other employees, and in front of the public (applicants and their representatives.);"
- The employees described the appellant as "paranoid, immature, and 'gung ho,'" and she "threatens, harasses and intimidates her subordinates;"
- They complained that the appellant would talk about an employee's performance with other employees, causing conflict; and
- They accused her of going "on the rampage," demanding that they tell her who is talking about her.

*Id.* In addition to the above specific criticisms, the employees also complained of the appellant's poor communication skills and of her improper handling of leave requests, including demanding the "reasons for requesting leave" and denying "the leave if she does not like the reason given." *Id.* The report further indicated that the "[m]orale in the clerical section is at an all-time low," and that all the employees "agree [that] this is the worst situation they have worked in, and most want to leave or transfer to other supervisors." *Id.* The employees also noted some recent improvement in the appellant's management style, but they all agreed that the appellant's "supervision [was] the worst in their careers," and that "they have been deeply offended and hurt by [the appellant's] insensitive and heavy-handed treatment of them, and all said they wished to be transferred to work under other supervisors." *Id.*

**Appx18**

12

The appellant acknowledged that she had a difficult set of employees to supervise, but seems to excuse her managerial failures by blaming her staff, accusing of them various infractions such as "excessive use of phone, government phone, either tardiness on a daily basis, lying on their time sheets, not producing the work that was given to them in time, profanity, tearing up pay slips, suspicious activities, like having a newspaper folded and pass[ed] around each other," and "[p]ersonal boxes" delivered to their cubicles. HT, Vol. 1 at 17. Even assuming this is true, however, it fails to address the appellant's obvious shortcomings with her performance. For example, all of the incidents outlined in the November 28, 2007 email involved the appellant's poor interaction with fellow employees. While the appellant argues that the employees were also at fault, there is no dispute that these events were reported to Ms. Dibbins and were not fabricated by her to find a reason to terminate the appellant during her probationary period. Likewise, Ms. Dibbins' rating the appellant as unacceptable on three of her Core Competencies (communication, teamwork and cooperation, and leadership) was in fact an accurate assessment. In the communication element, Ms. Dibbins noted that the appellant was "reactionary rather than composed in situations, which has caused disruptions in her unit," and that the appellant needed additional training in written communication. AF-I-2, Tab 19 at 15. As reported by the appellant's subordinates, the agency's evidence supports the conclusion that the appellant had been reactionary with her staff, creating conflict. Ms. Dibbins assessment of the appellant's written work was also accurate. The email the appellant wrote on November 27, 2007, is nearly incomprehensible. *See* AF-I-2, Tab 18 at 33. While the appellant testified that she was upset when writing that email because the employee had cursed at her, this does not take away from Ms. Dibbins accurate assessment.[3] Moreover, Ms.

---

[3] The appellant testified that she took days to write the January 2, 2008 letter to Agent Herlihy. However, this letter was also very poorly written.

**Appx19**

13

Bailey testified that the appellant was aware that Ms. Dibbins "always criticized" her writing skills. HT, Vol. 2 at 67.

Under teamwork and cooperation, Ms. Dibbins noted that the appellant's "unit experiences a significant disintegration of cohesion," which necessitated management and the union to form a focus group. *See* AF-I-2, Tab 19 at 15. While she acknowledged some of the employees were at fault, she noted that the appellant's reaction "inflamed the already volatile situation." *Id.* Under leadership, Ms. Dibbins noted that the appellant's unit was "unable to work cohesively." While the appellant seems to shift the blame for the dysfunction onto her employees, she was hired to supervise them, and to the extent that the unit was dysfunctional, it was her responsibility to correct the situation. Moreover, it appears that she not only failed to correct improper behavior, but contributed to the dysfunctionality of the unit. The appellant correctly pointed out that the Focus Group was created to solve the problems between her and staff; however, that does not mean that it absolved the appellant from her responsibilities as a supervisor. And, there was no evidence that the issues the appellant had with supervision were resolved by her own actions prior to her termination. After reviewing the entirety of the record concerning the appellant's termination, I find that the evidence in support of the appellant's termination during her probationary period is very strong as it is apparent she was unable to perform several significant job functions.

*The motive to retaliate on the part of the agency's officials was weak.*

The appellant argues that Ms. Dibbins' retaliatory motive is evident from the sudden change in her attitude towards the appellant after their meeting on November 26 or 27, 2007, when she told Ms. Dibbins about the meeting with the OIG and the disclosure. The appellant asserts that Ms. Bailey's testimony supports this finding. On the other hand, Ms. Dibbins denies this meeting took place, and while she admits that she was aware that the appellant had met with the OIG, she thought it concerned the Hadeed investigation, not the June 7, 2007

**Appx20**

65

14

safe incident. Ms. Dibbins testified that she was unaware of the appellant's disclosure about the safe incident until the processing of the appellant's EEO complaint in 2011 or 2012. To resolve credibility issues, an administrative judge must identify the factual questions in dispute, summarize the evidence on each disputed question, state which version she believes, and explain in detail why she found the chosen version more credible, considering such factors as: (1) the witness's opportunity and capacity to observe the event or act in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) a witness's bias, or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness's version of events; and (7) the witness's demeanor. *Hillen v. Department of the Army,* 35 M.S.P.R. 453, 458 (1987).

In this case, I find Ms. Dibbins' testimony more credible than the appellant's and Ms. Bailey's respective testimonies for the following reasons. At the hearing, I found Ms. Dibbins' to be a direct, straightforward witness, and I discerned no ambiguity or subterfuge in her testimony. With regard to the appellant's testimony, at each stage of the prior extensive EEO proceeding, the appellant claimed under oath that she had met with the OIG in December of 2007, not November. Again, before OSC, the appellant claimed that she met with the OIG in December 2007. In fact, she did not change her position until after the agency produced Ms. Dibbins' email dated November 28, 2007, stating that she was considering termination. At the hearing, the appellant claimed that she provided "approximate timing" of the meeting in prior testimony because it was not germane to that issue and that her memory was refreshed by Ms. Bailey's deposition. I do not find this persuasive because when an individual provides sworn testimony in multiple legal proceedings, it should be consistent to be believable. And, I do not find it justifiable to provide inconsistent testimony merely because it involved a different type of legal claim. Further, if the appellant had in fact met with Agent Herlihy the day before Thanksgiving as she

**Appx21**

now claims, I believe she would have specifically remembered that date the first time she provided a sworn statement in 2008 when her memory of the event was fresher.

Similarly, the appellant's and Ms. Bailey's testimony that they received two hours of administrative leave to meet with the OIG on November 21, 2007, and they met with the agents until late in the evening is not believable. I credit Agent Herlihy's testimony that at that time the agency routinely awarded two hours of administrative leave to all employees the day before Thanksgiving and his testimony that it was highly unlikely that he met with them into the evening the day before Thanksgiving. Additionally, Agent Herlihy testified that Agent Gaudiano had an annual party the night before Thanksgiving, and it was unlikely that he would have been able to stay. The appellant also testified that she faxed Mr. Herlihy an initial version of her written statement the Monday or Tuesday after the holiday; Agent Herlihy asked her to rewrite it; and she had a long conversation with him about Ms. Dibbins' reaction to their meeting. These statements, however, are contradicted by Agent Herlihy who testified that he did not receive a fax from the appellant and he "would not" ask her to rewrite her statement as it "would not be appropriate" to do so. And, while Agent Herlihy confirmed that he sent the appellant an email on December 17, 2007, he testified that it was his normal practice to send it within a "few days of the meeting" and he always returned documents in a "quick fashion." Agent Herlihy did not recall receiving any phone calls from the appellant or that the appellant was concerned about Ms. Dibbins being unhappy with her. Agent Herlihy has now retired and his testimony was forthright without dissimulation. I simply did not discern any sort of bias on his part, but merely an explanation of the normal procedures followed at that time. *See Holton v. Department of the Navy*, 2016 MSPB 39 (November 2, 2016)(citing with approval the use of Federal Rule of Evidence 4064, which permits the use of "a person's habit or an organization's routine

**Appx22**

16

practice" to prove compliance with that habit or practice "on a particular occasion").

In contrast, at the hearing of this matter, I was unimpressed with the appellant's demeanor as she appeared evasive, chaotic and at times, bordering on incoherent. Not only did she contradict her testimony from the EEO proceeding about the timing of the meeting with OIG, her testimony was also inconsistent about when she told Ms. Dibbins of that meeting. In the EEO proceeding, she testified that she told Ms. Dibbins in January 2008 of the OIG meeting, not November 26 or 27, 2007. *See* HT, Vol. 2, at 16. Further, based on the sheer number of complaints about the appellant from her subordinates, it defies common sense to believe that the appellant was unaware that her performance was problematic prior to her poor performance review in January 2008. Indeed, in her EEO proceeding, the appellant testified that "[t]hrough all my employment with CIS, I was constantly told by Ms. Dibbins that I did not have the managerial experience, I do not know how to manage the staff or my work," and that she was "called into [Ms. Dibbins'] office, listening to her criticism." *Id.* at 19. In the proceeding before me, it appeared that the appellant was attempting to mix-up the facts to such a degree to make a plausible winning argument, and I came away with the impression that she would change her testimony as necessary to further her position.

With regard to Ms. Bailey, her testimony that she set-up the meeting with the OIG about the safe being left open is contradicted by Agent Herlihy who testified the meeting was organized for purposes of the Hadeed investigation. Ms. Bailey was also impeached for testifying inconsistently with her prior deposition testimony with regard to the February 11, 2008 memo written by Ms. Dibbins. *See* HT, Vol. 2 at 79. At the hearing, I found Ms. Bailey to be less than credible and she appeared to have a bias to help the appellant's case. As I found above, it is not believable that the appellant and Ms. Bailey met with the OIG

**Appx23**

17

until late in the evening on Thanksgiving eve.[4] Thus, Ms. Bailey's testimony to that effect and with regard to the subsequent conversations with Ms. Dibbins seemed contrived to further the appellant's position. Also, I find it inherently improbable that Ms. Dibbins would tell Ms. Bailey that the appellant was fired based on her failure to disclose her employment with Michael Hadeed when Ms. Bailey had served as an informant with the OIG who was conducting the Hadeed investigation. For these reasons, I do not credit Ms. Bailey's testimony. Thus, I find that Ms. Dibbins was unaware of the disclosure concerning the June 7, 2007 safe incident until after termination decision was made.[5]

Conclusion

When viewing the totality of the evidence, I find that the agency proved by clear and convincing evidence that the appellant was not performing at an acceptable level during her probationary period and that it would have taken the same termination action even in the absence of her whistleblowing activity. The

---

[4] The appellant also argues that Mary Flores' testimony substantiates that the OIG meeting occurred in November 2007. At the hearing, she testified that "it was around the holidays, so it had to be November." HT, Vol. 2 at 111. However, it is undisputed that Ms. Flores did not personally attend the meeting with OIG, and her testimony is based on speculation that it was in November because of the holidays. I did not come away with a firm belief that Ms. Flores actually remembered the time frame in question.

[5] The agency did not present any evidence showing that it took similar actions against employees who were not whistleblowers, but who were otherwise similarly situated to the appellant. In *Whitmore*, the Board's reviewing court determined that "*Carr* does not impose an affirmative burden on the agency to produce evidence with respect to each and every one of the three *Carr* factors to weigh them each individually in the agency's favor." *Whitmore*, 680 F.3d at 1374. Rather, "the absence of any evidence relating to Carr factor three can effectively remove that factor from the analysis." *Id.; see Runstrom v. Department of Veterans Affairs*, 123 M.S.P.R. 169, ¶ 18 (2016) (finding that, due to lack of evidence that there were any employees similarly situated to the appellant, the third *Carr* factor was not significant for the analysis of that case). This is the situation presented in the instant matter. Accordingly, I find that the third *Carr* factor is insignificant due to the lack of evidence regarding similarly situated employees. *See Campbell v. Department of the Army*, 2016 MSPB 39, ¶ 20 (November 2, 2016).

**Appx24**

18

evidence of record demonstrates that the appellant was having substantial problems supervising and communicating with the employees she was hired to manage. The written evidence submitted by the agency also demonstrates that Ms. Dibbins was concerned about determining whether the appellant was able perform her duties prior to her probationary period concluding and that the decision to terminate the appellant was made about a month before the end of the her probation. *See* AF-I-2, Tab 18 at 11, 46. While the appellant asserts that the agency failed to provide the mediation to solve her problems with her staff, nothing requires the agency to take this step. Also, because Ms. Dibbins was unaware of the safe opening disclosure until well-after the termination decision, I find that the strength of any motive to retaliate was weak. Indeed, this seems to be a typical probationary termination based on the appellant's inability to perform basic job functions and not retaliation for engaging in protected activity.

## DECISION

The appellant's request for corrective action is DENIED.

FOR THE BOARD:

Sherry Linville
Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on **December 28, 2016**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first. You must establish the

**Appx25**

19

date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with the Court of Appeals. The paragraphs that follow tell you how and when to file with the Board or the federal court. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review. Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file it with:

> The Clerk of the Board
> Merit Systems Protection Board
> 1615 M Street, NW.
> Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

### Criteria for Granting a Petition or Cross Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to

**Appx26**

warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the

**Appx27**

pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j). If the petition is filed electronically, the online process itself will serve the petition on other e-filers. *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

**Appx28**

22

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## NOTICE TO THE APPELLANT REGARDING
## YOUR FURTHER REVIEW RIGHTS

You have the right to request review of this final decision by the United States Court of Appeals for the Federal Circuit.

The court must receive your request for review no later than 60 calendar days after the date this initial decision becomes final. *See* 5 U.S.C. § 7703(b)(1)(A) (as rev. eff. Dec. 27, 2012). If you choose to file, be very careful to file on time. The court has held that normally it does not have the authority to waive this statutory deadline and that filings that do not comply with the deadline must be dismissed. *See Pinat v. Office of Personnel Management,* 931 F.2d 1544 (Fed. Cir. 1991).

If you want to request review of this decision concerning your claims of prohibited personnel practices under 5 U.S.C. § 2302(b)(8), (b)(9)(A)(i), (b)(9)(B), (b)(9)(C), or (b)(9)(D), but you do not want to challenge the Board's disposition of any other claims of prohibited personnel practices, you may request review of this decision only after it becomes final by filing in the United States Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction. The court of appeals must receive your petition for review within 60 days after the date on which this decision becomes final. *See* 5 U.S.C. § 7703(b)(1)(B) (as rev. eff. Dec. 27, 2012). If you choose to file, be very careful to file on time. You may choose to request review of the Board's decision in the United States Court of Appeals for the Federal Circuit or any other court of appeals of competent jurisdiction, but not both. Once you choose to seek review in one court of appeals, you may be precluded from seeking review in any other court.

**Appx29**

23

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703) (as rev. eff. Dec. 27, 2012). You may read this law as well as other sections of the United States Code, at our website, http://www.mspb.gov/appeals/uscode/htm. Additional information about the United States Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11. Additional information about other courts of appeals can be found at their respective websites, which can be accessed through http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

If you are interested in securing pro bono representation for your court appeal, that is, representation at no cost to you, the Federal Circuit Bar Association may be able to assist you in finding an attorney. To find out more, please click on this link or paste it into the address bar on your browser:

https://fedcirbar.org/Pro-Bono-Scholarships/Government-Employees-Pro-Bono/Overview-FAQ

The Merit Systems Protection Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**Appx30**

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

U.S. Mail

Amanda Mojdeh Raiszadeh
5973 Havener House Way
Centreville, VA 20120

<u>Appellant Representative</u>

Electronic Mail

Thomas F. Hennessy
Virginia Family & Employment Law Center
4015 Chain Bridge Road, Suite G
Fairfax, VA 22030

<u>Agency Representative</u>

Electronic Mail

Laura J. Carroll
Department of Homeland Security
USCIS; U.S. Department of Homeland Security
70 Kimball Avenue, Room 103
South Burlington, VT 05403

_____
November 23, 2016
(Date)

JoAnn Atkinson
Paralegal Specialist

**Appx31**

# UNITED STATES OF AMERICA
# MERIT SYSTEMS PROTECTION BOARD

AMANDA MOJDEH RAISZADEH,  
Appellant,

v.

DEPARTMENT OF HOMELAND  
SECURITY,  
Agency.

DOCKET NUMBERS  
DC-0752-12-0648-I-2  
DC-1221-12-0452-W-2

DATE: December 9, 2015

## THIS ORDER IS NONPRECEDENTIAL[1]

Thomas F. Hennessy, Esquire, Fairfax, Virginia, for the appellant.

Laura J. Carroll, Esquire, South Burlington, Vermont, for the agency.

### BEFORE

Susan Tsui Grundmann, Chairman  
Mark A. Robbins, Member

### ORDER

¶1     The appellant has filed a petition for review of the initial decision, which denied her request for corrective action in this individual right of action (IRA) appeal. For the reasons discussed below, we GRANT the appellant's petition for review and REMAND MSPB Docket No. DC-1221-12-0452-W-2 to the regional

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. See 5 C.F.R. § 1201.117(c).

**Appx32**

2

office for further adjudication in accordance with this Order. Specifically, we find that it is necessary to remand the appeal for the administrative judge to assess whether the agency proved by clear and convincing evidence that it would have assigned the appellant an unacceptable performance rating and terminated her employment in the absence of her disclosure.

## BACKGROUND

¶2      The agency appointed the appellant to the position of Citizen and Immigration Services (CIS) Assistant in March 2007, and converted her position to a Supervisory CIS Assistant in April 2007. *Raiszadeh v. Department of Homeland Security*, MSPB Docket No. DC-0752-12-0648-I-2, Appeal File (I-2 AF), Tab 18 at 11-12. In November or December 2007, the appellant and a coworker met with the agency's Office of Inspector General (OIG). *See id.* at 38; *see also* Hearing Transcript (HT), February 27, 2014, Volume (Vol.) II at 154. On December 28, 2007, the appellant's supervisor (S.D.) rated her performance as unacceptable overall. I-2 AF, Tab 19 at 6-16. In a January 2008 letter to OIG, the appellant reported that a safe containing sensitive naturalization certificates had been left open in June 2007. I-2 AF, Tab 18 at 39. On February 19, 2008, S.D. issued a termination notice to the appellant that cited performance deficiencies during her probationary period.[2] *Id.* at 46-47.

¶3      In September 2011, the appellant filed a complaint with the Office of Special Counsel (OSC) asserting that the agency gave her a poor performance evaluation and terminated her in retaliation for her November 2007 disclosures to OIG, which included both the issue with the safe in June 2007, and information concerning other personnel problems in her office.[3] I-2 AF, Tab 9 at 43-64. The

---

[2] The agency later permitted the appellant to resign effective the day she was scheduled to be terminated. I-2 AF, Tab 18 at 50.

[3] In June 2008, prior to her OSC complaint, the appellant filed an equal employment opportunity complaint. *Raiszadeh v. Department of Homeland Security*, MSPB Docket No. DC-1221-12-0452-W-1, Initial Appeal File (W-1 IAF), Tab 7, Subtab 4h. She then

**Appx33**

5

was a contributing factor in a personnel action taken against her.[7] *Lu v.*
*Department of Homeland Security*, 122 M.S.P.R. 335, ¶ 7 (2015) (citing 5 U.S.C.
§ 1221(e)(1)). If the appellant makes out a prima facie case, then the agency is
given an opportunity to prove, by clear and convincing evidence, that it would
have taken the same personnel action in the absence of the protected disclosure.[8]
*Id.* (citing 5 U.S.C. § 1221(e)(1)-(2)).

The appellant reasonably believed that her disclosure to OIG concerning the
June 2007 safe incident evidenced a violation of an agency rule.

¶8        A protected disclosure is a disclosure of information that an appellant
reasonably believes evidences a violation of any law, rule, or regulation, gross
mismanagement, a gross waste of funds, an abuse of authority, or a substantial
and specific danger to public health or safety. *Linder v. Department of
Justice*, 122 M.S.P.R. 14, ¶ 12 (2014). To establish that an appellant made a
protected disclosure, she need not prove that the matter disclosed actually
established one of the categories of wrongdoing listed under 5 U.S.C.
§ 2302(b)(8)(A) or (B); rather, she must show that the matter disclosed was one
that a reasonable person in her position would believe evidenced any of the
specified categories of wrongdoing. *Webb v. Department of the
Interior*, 122 M.S.P.R. 248, ¶ 6 (2015).

¶9        We find that the appellant has proven this element based upon her
disclosure of an agency rule violation. *See* 5 U.S.C. § 2302(b)(8)(B)(i). In
November or December 2007, the appellant and a coworker met with OIG. I-2
AF, Tab 18 at 38. In the appellant's January 2008 letter to OIG, she thanked OIG
for meeting with her and apologized for her delay in sending the information that

---

[7] A preponderance of the evidence is that degree of relevant evidence that a reasonable
person, considering the record as a whole, would accept as sufficient to find that a
contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.4(q).

[8] Clear and convincing evidence is that measure or degree of proof that produces in the
mind of the trier of fact a firm belief as to the allegations sought to be established.
5 C.F.R. § 1209.4(e).

**Appx34**

6

they had discussed. I-2 AF, Tab 9 at 65. Specifically, she asserted, inter alia, that, on Friday, June 7, 2007, after she noticed that a safe containing naturalization certificates was left open, she reported the incident to S.D.[9]  *Id.* The appellant further asserted that on the following Monday, when she conducted an audit and counted the naturalization certificates, 300 certificates were missing and that the documentation for the missing certificates was not given to her until a week later. *Id.*

¶10    The appellant asserts that her disclosure to OIG was protected, in part because she disclosed a violation of an agency law, rule, or regulation. PFR File, Tab 5 at 2. The Board has suggested that an agency "rule" includes established or authoritative standards for conduct or behavior. *Chavez v. Department of Veterans Affairs*, 120 M.S.P.R. 285, ¶ 25 (2013). The appellant testified that there were agency rules or regulations that required that naturalization certificates be kept secure and that an employee could be "terminated on the spot" for leaving the safe open. HT, Vol. I at 35-36. The appellant's belief that there was an agency rule regarding not leaving the safe open is supported by the agency's November 9, 2007 memorandum, issued to her work unit prior to her disclosures to OIG, that stated, "Employees who engage in security violations (e.g., safe left open . . . ) may be subject to disciplinary or adverse action." I-2 AF, Tab 19 at 5. That the safe incident was a violation of an agency rule is further supported by the Chief of Employment and Labor Relations (ELR), who testified that he believed the incident was a violation of agency policy. HT, Vol. I at 155. Accordingly, we find that a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the appellant could reasonably

---

[9] A representative from OIG declared in May 2012, that there was no electronic record of the appellant's complaint. I-2 AF, Tab 19 at 17. However, a former OIG employee testified that he spoke to the appellant and received her letter. CCCD.

**Appx35**

7

conclude that the safe incident evidenced a violation of an agency rule.[10]  *See Chavez*, 120 M.S.P.R. 285, ¶ 25 (finding that the appellant's disclosure that an employee violated a rule by borrowing money from a patient was protected because a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the appellant could reasonably conclude that the conduct violated an agency rule).

The appellant's protected disclosure was a contributing factor in her performance appraisal and termination.

¶11    The most common way of proving that a disclosure was a contributing factor in a personnel action is the knowledge-timing test.[11]  *Shannon v. Department of Veterans Affairs*, 121 M.S.P.R. 221, ¶ 23 (2014). Under that test, an appellant can prove the contributing factor element through evidence that the official taking the personnel action knew of the whistleblowing disclosure and took the personnel action within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action.  *Id.*  An appellant also may show that a protected disclosure was a contributing factor by proving that the official taking the action had constructive knowledge of the protected disclosure, even if the official lacked actual knowledge.  *Nasuti v. Department of State*, 120 M.S.P.R. 588, ¶ 7 (2014).  One way of establishing constructive knowledge is by demonstrating that an individual with actual knowledge of the disclosure influenced the official accused of taking the retaliatory action.  *Id.*

¶12    We find that S.D. at least had constructive knowledge of the appellant's disclosure.  She was the official who assigned the appellant the unacceptable performance rating and terminated her.  I-2 AF, Tab 18 at 46-47, Tab 19 at 6-16.

---

[10] The administrative judge found that the appellant did not reasonably believe that she was disclosing a danger to public health or safety. ID at 10. We see no reason to disturb this finding.

[11] The appellant's performance appraisal and subsequent termination constitute personnel actions as defined by 5 U.S.C. § 2302(a)(2).

**Appx36**

8

There is testimony that S.D. knew about the appellant's disclosure to OIG by the end of November 2007, HT, Vol. II at 61-63, which S.D. disputes, *id.* at 161. However, the ELR Chief testified that he had knowledge of the appellant's disclosures to OIG. HT, Vol. I at 154. He advised S.D. about managing the appellant's performance and her decision to terminate the appellant. I-2 AF, Tab 18 at 32-37, 43-44. The supervisor of another unit also testified that she knew that the appellant made her disclosure to OIG around November and that S.D. often sought her advice about "issues" concerning the appellant. HT, Vol. II at 111. The agency does not dispute the testimony of either of these individuals. Thus, because those who advised S.D. concerning the personnel actions knew about the disclosure, we find that she had at least constructive knowledge of the disclosure. *See generally Aquino v. Department of Homeland Security,* 121 M.S.P.R. 35, ¶¶ 21-24 (2014).

¶13    Regarding the timing of the personnel actions, the Board has held that personnel actions that were alleged to have begun within 1 to 2 years of a disclosure satisfy the "timing" component of the knowledge-timing test. *See Schnell v. Department of the Army,* 114 M.S.P.R. 83, ¶ 22 (2010). Therefore, we find that the timing component also is met because agency officials became aware of the appellant's disclosure in late November/early December 2007, and the personnel actions took place shortly thereafter in December 2007, and February 2008, respectively.

The appeal is remanded to the administrative judge to assess whether the agency would have assigned the appellant an unacceptable performance appraisal and terminated her in the absence of her disclosure under the clear and convincing evidence standard.

¶14    Having found that the appellant established that her protected disclosure was a contributing factor in her unacceptable performance appraisal and termination, the burden now shifts to the agency to establish by clear and convincing evidence that it would have taken the same personnel actions in the absence of the protected disclosure. 5 U.S.C. § 1221(e)(2); *Aquino,* 121 M.S.P.R.

**Appx37**

9

35, ¶ 25. Because the administrative judge concluded that the appellant failed to prove that she made a protected disclosure, she made no findings as to whether the agency met its burden in this regard by clear and convincing evidence. ID at 10. Based upon the nature and timing of the agency's actions and the appellant's disclosure, and the fact that the administrative judge heard the witnesses' testimony, we believe the administrative judge is in the best position to make the necessary factual and credibility determinations in the first instance to decide if the agency has established by clear and convincing evidence that it would have taken the same actions in the absence of the appellant's protected disclosure. *See Mithen v. Department of Veterans Affairs*, 119 M.S.P.R. 215, ¶ 23 (2013) (remanding the question on the clear and convincing evidence standard to the administrative judge for, among other things, credibility determinations). We accordingly remand the appeal to the administrative judge for an assessment of whether the agency met its burden by clear and convincing evidence under the standards articulated in *Whitmore v. Department of Labor*, 680 F.3d 1353, 1368 (Fed. Cir. 2012), and *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999). *See Mithen*, 119 M.S.P.R. 215, ¶ 24. The administrative judge held a hearing in this matter and correctly informed the parties of their respective burdens of proof beforehand. We deem the record complete. If, however, the administrative judge deems it necessary for proper adjudication of this appeal to allow additional discovery or to conduct a supplemental hearing, she retains the discretion to do so.

## ORDER

¶15      For the reasons discussed above, we remand MSPB Docket No. DC-1221-12-0452-W-2 to the regional office for further adjudication in accordance with this Order. This is the final decision of the Merit Systems Protection Board regarding the constructive discharge appeal in MSPB Docket No. DC-0752-12-0648-I-2. 5 C.F.R. § 1201.113(c).

**Appx38**

10

## NOTICE TO THE APPELLANT
### REGARDING YOUR FURTHER REVIEW RIGHTS
### IN MSPB DOCKET NO. DC-0752-12-0648-I-2

You have the right to request review of this final decision by the U.S. Court of Appeals for the Federal Circuit. You must submit your request to the court at the following address:

United States Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

The court must receive your request for review no later than 60 calendar days after the date of this order. *See* 5 U.S.C. § 7703(b)(1)(A) (as rev. eff. Dec. 27, 2012). If you choose to file, be very careful to file on time. The court has held that normally it does not have the authority to waive this statutory deadline and that filings that do not comply with the deadline must be dismissed. *See Pinat v. Office of Personnel Management*, 931 F.2d 1544 (Fed. Cir. 1991).

If you need further information about your right to appeal this decision to court, you should refer to the Federal law that gives you this right. It is found in title 5 of the United States Code, section 7703 (5 U.S.C. § 7703) (as rev. eff. Dec. 27, 2012). You may read this law as well as other sections of the United States Code, at our website, http://www.mspb.gov/appeals/uscode.htm. Additional information is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.                                    The

**Appx39**

11

Merit Systems Protection Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.


FOR THE BOARD:          _____
                        William D. Spencer
                        Clerk of the Board

Washington, D.C.


**Appx40**

## CERTIFICATE OF SERVICE

I certify that this Order was sent today to each of the following:

| | |
|---|---|
| Electronic Mail | Thomas F. Hennessy<br>Virginia Family & Employment Law Center<br>4015 Chain Bridge Road, Suite 6<br>Fairfax, VA 22301 |
| U.S. Mail | Amanda Mojdeh Raiszadeh<br>5973 Havener House Way<br>Centreville, VA 20120 |
| Electronic Mail | Laura J. Carroll<br>Department of Homeland Security<br>Associate Counsel<br>Office of the Principal Legal Advisor<br>70 Kimball Avenue, Room 103<br>South Burlington, VT 05403<br><br>Washington Regional Office<br>U.S. Merit Systems Protection Board<br>1901 South Bell Street<br>Suite 950<br>Arlington, Virginia 22202-4802 |

December 9, 2015
_____
(Date)

_____
Dinh Chung
Case Management Specialist

**Appx41**

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**ATLANTA REGIONAL OFFICE**

| | |
|---|---|
| AMANDA MOJDEH RAISZADEH,<br>Appellant, | DOCKET NUMBER<br>DC-0752-12-0648-I-2<br>DC-1221-12-0452-W-2 |
| v. | |
| DEPARTMENT OF HOMELAND<br>SECURITY,<br>Agency. | DATE: January 27, 2015 |

Thomas F. Hennessy, Fairfax, Virginia, for the appellant.

Laura J. Carroll, South Burlington, Vermont, for the agency.

**BEFORE**
Sherry Linville
Administrative Judge

**INITIAL DECISION**

The appellant timely filed an individual right of action (IRA) appeal with the Merit Systems Protection Board (Board) and alleged the agency gave her a bad performance review and terminated her during her probationary period in reprisal for her protected whistleblower activity. Appeal File, Docket No. DC-1221-12-0452-W-1, (AF-W-1) Tab 1. On February 27 and March 12, 2014, I held the appellant's requested hearing after finding that the Board has jurisdiction over this appeal. 5 U.S.C. § 1221(a) and 1214(a)(3); *Yunus v. Department of Veterans Affairs*, 242 F.3d 1367, 1371 (Fed. Cir. 2001). For the reasons explained below, the appellant's request for corrective action is DENIED.

**Appx42**

2

## ANALYSIS AND FINDINGS

Background

Effective March 18, 2007, the agency appointed the appellant to the position of Citizen and Immigration Services (CIS) Assistant, GS-1802-07, which was later converted to the position of Supervisory CIS Assistant, GS-1802-09, on April 1, 2007.  Appeal File, Docket No. DC-0752-12-0648-I-2, (AF-I-2) Tab 18 at 12-13.  The appellant had no prior experience working for the federal government and was required to complete a probationary period of one year.  *Id.* In her new position, the appellant supervised approximately seven to eight clerical/support employees of the CIS Washington Field Office in Fairfax, Virginia.  *Id.* at 23-31, 45.  The appellant's immediate supervisor was Susan Dibbins who was the Field Office Director, GS-15.  Hearing Transcript, Vol. 2 at 134-35.

In November/December 2007, the appellant and a coworker, Cheri Bailey, met with the agency's Office of Inspector General (OIG).  AF-1-2, Tab 30, Exhibit I.  During this meeting, the appellant complained of several incidents involving her subordinate employees, and that on June 7, 2007, a safe was left open containing naturalization certificates.  *Id.*  The appellant acknowledged that she "immediately notified Ms. Dibbins" of the unsecured safe, and that she conducted an audit the following Monday.  During the audit, she discovered 300 naturalization certificates that "were not accounted for," i.e., she was unable to locate a requisition (G-514) form.  *Id.*  While she recognized that she was later provided a copy of the G-514 form for the certificates, she "still [had her] concern."  *Id.*  On January 2, 2008, the appellant sent Timothy Herlihy, OIG, a letter outlining her complaints.  *Id.*

On December 28, 2007, Ms. Dibbins rated the appellant as unacceptable on three of her Core Competencies (communication, teamwork and cooperation, and leadership) resulting in an overall performance rating of unacceptable.  AF-I-2, Tab 19 at 6-16.  The appellant electronically signed the performance evaluation

**Appx43**

3

on January 11, 2008. *Id.* On February 11, 2008, Ms. Dibbins sent an email to Mr. Berkenkemper stating that she wanted to terminate the appellant because "[s]ome events happened last week that were the final straw and she cannot continue in a supervisory role here any longer." AF-I-2, Tab 30, Exhibit D. On February 19, 2008, Ms. Dibbins issued the appellant her termination notice, which cited deficiencies in her performance during her probationary period. AF-1-2, Tab 18 at 46-47. While the termination letter effectuated the appellant's termination on February 19th, the agency permitted the appellant to submit her resignation on February 29, 2008, retroactive to the termination date. *Id.* at 50.

The appellant filed an equal employment opportunity complaint against the agency, asserting that she was subjected to discrimination and a hostile work environment on the bases of her national origin (Iran) and religion (Islam) on June 4, 2008. AF-W-1, Tab 7 at 30-33. On June 16, 2010, Equal Employment Opportunity Commission Administrative Judge Frances del Toro issued a summary judgment in the agency's favor. *Id.* at 9-19. The appellant then filed a civil action in the Eastern District of Virginia, which was also dismissed in favor of the agency on March 16, 2012. *Id.* at 3-4. In the meantime, on September 1, 2011, the appellant filed a complaint with the Office of Special Counsel (OSC), asserting that her poor performance evaluation and subsequent termination were in reprisal for her disclosures to Agent Herlihy in 2007. AF-W-1, Tab 5, Attachment 2. In response to OSC questions about the delay in filing the complaint, the appellant's counsel replied that the appellant was given "a poor performance evaluation and a notice that she was terminated because of her race and national origin *and* because she complained to OIG," and since her termination, the appellant had "focused on the her claims under Title VII and the Civil Rights Act of 1964, and more recently it has been her intent to obtain some information that would support her OSC complaint" from Ms. Dibbins' deposition. *Id.*, Attachment 4 (emphasis in original).

**Appx44**

4

On April 6, 2012, the appellant filed an individual right of action (IRA) appeal, in which she alleged that the agency gave her a lower performance rating and removed her from federal service in retaliation for her alleged whistleblowing activities.[1] AF-W-1, Tab 1. By Order dated April 10, 2012, the parties were notified of the Board's proof requirements when adjudicating an IRA appeal. AF-W-1, Tab 3. The appellant submitted a response on April 23, 2012, and the agency submitted the agency's file on April 30, 2012. AF-W-1, Tabs 5, 7. In its narrative response, the agency moved for a dismissal, arguing that the appeal should be barred by the doctrine of laches; the appellant's alleged whistleblowing activity was not a contributing factor in the agency's decision; and/or the appellant failed to raise a nonfrivolous allegation that her alleged disclosures were protected under 5 U.S.C. § 2302(b)(8). AF-W-1, Tab 7. In its response, the agency also argued that the appellant had submitted her resignation. *Id*. The appellant filed a second response on June 22, 2012, addressing the agency's narrative response and argued that she had not resigned voluntarily. AF-W-1, Tab 14. Based on this information, a second case was opened under docket number DC-0752-12-0648-I-1 and the appeals were consolidated. AF-W-1, Tab 19.

To clarify certain jurisdictional issues, I issued a Second Order on IRA Jurisdiction and Proof Requirements on June 25, 2012. AF-W-1, Tab 15. The appellant submitted a third response addressing the jurisdictional and exhaustion issues on July 6, 2012, and the agency submitted its response on July 12, 2012. AF-W-1, Tabs 16, 17. The appellant submitted a fourth response to these issues on July 20, 2012. AF-W-1, Tab 18. Thereafter, both appeals were dismissed

---

[1] Although OSC had not issued a close-out letter with rights to appeal to the Board, the appellant's appeal was not premature because 120 days had passed since she had filed her complaint. *See* 5 U.S.C. § 1214(a)(3)(B); AF-W-1, Tab 5.

**Appx45**

5

without prejudice pending the Board's decision in *Day v. Department of Homeland Security*, 2013 M.S.P.B. 49 (June 26, 2013).    AF-W-1, Tab 26.

The appeals were refiled *sua sponte* on August 6, 2013.    Appeal File Docket Number DC-0752-12-0648-I-1 (AF-I-2), Tab 1.    During a telephone conference on October 24, 2013, I informed the appellant's counsel that I still had questions concerning whether she had exhausted her administrative remedies with the OSC and provided the parties with another opportunity to brief this issue and any retroactivity issues.    AF-I-2, Tabs 4, 7.    Again, both parties submitted responses to these issues.    AF-I-2, Tabs 9, 10, 13.

At the prehearing conference, I found that the appellant had raised a nonfrivolous allegation that she made a protected disclosure when in late 2007, she informed the agency's Office of Inspector General (OIG) of the June 7, 2007 safe incident.    AF-I-2, Tab 30, Exhibit I. (Number 1 as provided in the letter dated January 2, 2008, to Agent Herlihy).    As to the remaining disclosures, however, I found that the appellant either failed to exhaust her administrative remedies before the OSC and/or did not raise nonfrivolous allegations that she engaged in whistleblowing activity by making a protected disclosure.    *Id.* Further, I found that the appellant had raised only two personnel actions to OSC: low performance rating and probationary termination, and thus, those were the personnel actions addressed at the hearing.[2]    *Id.*    As stated previously, the hearing was held on February 27 and March 12, 2014.

General Legal Standard

The Board has jurisdiction over an IRA appeal if the appellant has exhausted her administrative remedies before the OSC and makes nonfrivolous allegations that: (1) She engaged in whistleblowing activity by making a

---

[2] With regard to the appellant's involuntary resignation claim, because the appellant was a probationary employee at the time, I found that the Board has jurisdiction over her appeal based on her IRA, and thus, her involuntary resignation claim was subsumed in the pending IRA.    AF-I-2, Tab 26.

**Appx46**

6

protected disclosure; and (2) the disclosure was a contributing factor in the agency's decision to take or fail to take a personnel action. *Yunus*, 242 F.3d 1367, 1371.

For an appellant who establishes Board jurisdiction over her IRA appeal to be entitled to corrective action over her claims, she must establish by a preponderance of the evidence[3] the following four elements: (1) the management official has the authority to take, recommend, or approve any personnel action; (2) the aggrieved employee made a disclosure protected under 5 U.S.C. § 2302(b)(8)(A); (3) the management official used her authority to take, or refuse to take, a personnel action against the aggrieved employee; and (4) the protected disclosure was a contributing factor in the agency's personnel action. *See Chambers v. Department of Interior*, 602 F.3d 1370, 1376 (Fed. Cir. 2010); *Lachance v. White*, 174 F.3d 1378, 1380 (Fed. Cir. 1999), *cert. denied*, 528 U.S. 1153 (2000). If the appellant meets that burden, the Board must order corrective action unless the agency establishes by clear and convincing evidence[4] that it would have taken the same personnel action in the absence of the disclosure. *Whitmore*, 680 F.3d at 1364. Evidence only clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record, and despite the evidence that fairly detracts from that conclusion. *Id.* at 1368.

A "personnel action" is defined as follows: (i) an appointment; (ii) a promotion; (iii) an action under 5 U.S.C. chapter 75 or other disciplinary or corrective action; (iv) a detail, transfer, or reassignment; (v) a reinstatement; (vi)

---

[3] A preponderance of the evidence is that amount of relevant evidence which a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely true than untrue. 5 C.F.R. § 1201.56(c)(2).

[4] Clear and convincing evidence is that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established. 5 C.F.R. § 1209.4(d).

**Appx47**

7

a restoration; (vii) a reemployment; (viii) a performance evaluation under 5 U.S.C. chapter 43; (ix) a decision concerning pay, benefits, or awards, or concerning education or training if the education or training may reasonably be expected to lead to an appointment, promotion, performance evaluation, or other personnel action; (x) a decision to order psychiatric testing or examination; (xi) the implementation or enforcement of any nondisclosure policy, form, or agreement; and (xii) any other significant change in duties, responsibilities, or working conditions.   5 U.S.C. § 2302(a)(2)(A).   *See Mattil v. Department of State*, 118 M.S.P.R. 662, ¶ 14 (2012).

Protected Disclosure

A protected disclosure is a disclosure that the appellant reasonably believes evidences a violation of law, rule, or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. *See* 5 U.S.C. § 2302(b)(8)(A); *Chambers v. Department of Interior*, 515 F.3d 1362, 1367 (Fed. Cir. 2008). A reasonable belief exists if a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the appellant could reasonably conclude that the actions of the government evidence one of the categories of wrongdoing set out in 5 U.S.C. § 2302(b)(8)(A). *Lachance*, 174 F.3d 1378, 1381.

To establish that the appellant had a reasonable belief that the information she disclosed evidenced one of these categories of wrongdoing, she need not prove that the condition disclosed actually established a regulatory violation or any of the other situations detailed under 5 U.S.C. § 2302(b)(8)(A); rather, she must only show that the matter disclosed was one which a reasonable person in her position would believe evidenced any of the situations specified in 5 U.S.C. § 2302(b)(8). *See Huffman v. Office of Personnel Management*, 92 M.S.P.R. 429, ¶ 9 (2002).

**Appx48**

8

The disclosure cannot be based on a "purely subjective" belief. *Giove v. Department of Transportation*, 230 F.3d 1333, 1338 (Fed. Cir. 2000); *Lachance*, 174 F.3d 1378, 1380-81. Rather, it must be based on a reasonable interpretation of the events available to the appellant when she made her disclosure. *See Askew v. Department of the Army*, 88 M.S.P.R. 674, 678-79 (2001). The Board is required to consider all evidence presented on this issue, including that which detracts from a reasonable belief. *See Haley v. Department of the Treasury*, 977 F.2d 553, 557 (Fed. Cir. 1992), *cert. denied*, 508 U.S. 950 (1993).

In determining if the appellant had a reasonable belief, the Board considers whether she was familiar with the alleged improper agency activities and was therefore in a position to form such a belief as well as whether her belief was shared by other similarly-situated employees. *See Chianelli v. Environmental Protection Agency*, 86 M.S.P.R. 651, ¶ 14 (2000), *aff'd*, 8 Fed. Appx. 971 (Fed. Cir.), *cert. denied*, 122 S. Ct. 570 (2001); *McGrath v. Department of the Army*, 83 M.S.P.R. 48, ¶ 15 (1999). Whether the agency investigated the appellant's claims may be considered in determining their legitimacy. *See Kinan v. Department of Defense*, 87 M.S.P.R. 561, ¶¶ 13-14 (2001). Here, the appellant has asserted that she had a reasonable belief that her disclosure of the June 7, 2007 safe incident was a violation of law, rule, or regulation and/or a substantial and specific danger to public health or safety, and that her belief was based on the fact that "300 naturalization certificates were unaccounted for," and the "recent arrest of DHS employee Robert Schofield for selling naturalization certificates." AF-W-1, Tab 14 at 10.

Early in this appeal the agency moved to dismiss based on the doctrine of laches arguing that "memories have faded" and it was "prejudiced in its defense" as there were no records or documents preserved on the whistleblowing issues. While I denied the agency's motion, its case most certainly has suffered as it was unable to produce a single document relevant to the June 7, 2007 safe incident, and I am relying solely on the memories of the witnesses that testified. The

**Appx49**

94

9

appellant's case, however, also appears to have suffered from the passage of time because she failed to address the June 7, 2007 safe incident in any substantive manner. The appellant testified that the safe was left open on two occasions. Hearing Transcript, Vol. 1 at 42-46. While her testimony is vague and imprecise, it seems that the first time she testified the safe was left open was in October, not June. Even more confusing, the appellant testified that the "second time the safe was left open" was in November 2007 and that was when she discovered the 300 "unaccounted for" naturalization certifications. Her OSC complaint, however, never mentions the safe being left open in October or November. Indeed, the only date provided in the appellant's disclosure was June 7, 2007, and I cannot discern from her testimony whether the safe was even left open on that date. Thus, based on the appellant's testimony, I cannot conclude that she had a reasonable belief that the unsecured safe in June was an improper agency activity.

Even if I assume that the appellant's memory had failed her and the events that she described in November actually occurred in June, I do not believe she carried her burden of showing that her disclosure was protected. While the appellant has repeatedly tied this incident to the Schofield arrest, there was absolutely no suggestion of fraud associated with the 300 naturalization certificates. There is no indication that certificates were missing or had been sold. While I realize that the 300 certificates did not have a G-514 requisition form when the appellant performed her audit of the safe, that fact by itself does not provide a reasonable basis to believe that a violation of law occurred or that the public was in imminent danger. Moreover, it is undisputed that the appellant was provided a G-514 form for the certificates several days later, and thus, she knew that the certificates had been accounted for. Nevertheless, she failed to provide a reason why this was an insufficient remedy. Indeed, Ms. Dibbins' uncontroverted testimony indicated that they had appropriately addressed the situation by reporting "the [unsecured safe] up [their] chain of command," and sending a "significant incident report" to "the leadership of USCIS." Hearing

**Appx50**

10

Transcript, Vol. 2 at 161-62. There is simply no evidence supporting the appellant's bald faced assertion that this was something other than a mistake. Thus, I unable to conclude that a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the appellant would believe that this incident constituted a violation of law, rule or regulation or that the incident concerned a danger to public health or safety. *Chambers,* 515 F.3d at 1369 (To determine whether a disclosed danger to public health or safety is sufficiently substantial and specific to warrant protection under the WPA, the likelihood and imminence of the alleged harm resulting from the danger must be considered.).

Further, I simply do not have confidence that the appellant herself reasonably believed that the missing G-514 report was a violation of law or a danger to public health or safety. If I assume the event occurred in June, she waited over 5 months to report her concerns to OIG, and I find it unbelievable that she would have failed to report this potential crime sooner if she believed it to be true, particularly in light of the Schofield arrest and the possibility that she could be implicated.[5] Finally, there is no record of an OIG complaint on file, which further calls into question the quality of the appellant's "proof." *See* AF-I-2, Tab 19. Absent a reasonable belief to support her allegation, I find that the appellant has failed to present a prima facie case of reprisal for whistleblowing. *Gergick v. General Services Administration,* 43 M.S.P.R. 651, 659 (1990).

---

[5] The appellant testified that the safe was located in her office and she was one of three people with the combination. Hearing Transcript, Vol. 1 at 38.

**Appx51**

11

## DECISION

The appellant's request for corrective action is DENIED.

FOR THE BOARD:                         _____/S/_____

                                              Sherry Linville
                                              Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on **March 3, 2015**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first. You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with the Court of Appeals. The paragraphs that follow tell you how and when to file with the Board or the federal court. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review if you believe that the settlement agreement is unlawful, was involuntary, or was the result of fraud or mutual mistake. Your petition, with supporting evidence and argument, must be filed with Clerk of the Board at the address below.

**Appx52**

12

If the other party has already filed a timely petition for review, you may file a cross petition for review. Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file it with:

> The Clerk of the Board
> Merit Systems Protection Board
> 1615 M Street, NW.
> Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

**Criteria for Granting a Petition or Cross Petition for Review**

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

**Appx53**

13

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. A petition for review

**Appx54**

14

must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j). If the petition is filed electronically, the online process itself will serve the petition on other e-filers. *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

### NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

### NOTICE TO THE APPELLANT REGARDING
### YOUR FURTHER REVIEW RIGHTS

You have the right to request review of this final decision by the United States Court of Appeals for the Federal Circuit.

**Appx55**

The court must receive your request for review no later than 60 calendar days after the date this initial decision becomes final. *See* 5 U.S.C. § 7703(b)(1)(A) (as rev. eff. Dec. 27, 2012). If you choose to file, be very careful to file on time. The court has held that normally it does not have the authority to waive this statutory deadline and that filings that do not comply with the deadline must be dismissed. *See Pinat v. Office of Personnel Management,* 931 F.2d 1544 (Fed. Cir. 1991).

If you want to request review of this decision concerning your claims of prohibited personnel practices under 5 U.S.C. § 2302(b)(8), (b)(9)(A)(i), (b)(9)(B), (b)(9)(C), or (b)(9)(D), but you do not want to challenge the Board's disposition of any other claims of prohibited personnel practices, you may request review of this decision only after it becomes final by filing in the United States Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction. The court of appeals must receive your petition for review within 60 days after the date on which this decision becomes final. *See* 5 U.S.C. § 7703(b)(1)(B) (as rev. eff. Dec. 27, 2012). If you choose to file, be very careful to file on time. You may choose to request review of the Board's decision in the United States Court of Appeals for the Federal Circuit or any other court of appeals of competent jurisdiction, but not both. Once you choose to seek review in one court of appeals, you may be precluded from seeking review in any other court.

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703) (as rev. eff. Dec. 27, 2012). You may read this law as well as other sections of the United States Code, at our website, http://www.mspb.gov/appeals/uscode/htm. Additional information about the United States Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is

**Appx56**

16

contained within the court's <u>Rules of Practice</u>, and <u>Forms</u> 5, 6, and 11. Additional information about other courts of appeals can be found at their respective websites, which can be accessed through http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

   If you are interested in securing pro bono representation for an appeal to the United States Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for a list of attorneys who have expressed interest in providing pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Merit Systems Protection Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**Appx57**

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

U.S. Mail        Amanda Mojdeh Raiszadeh
                 5973 Havener House Way
                 Centreville, VA 20120

<u>Appellant Representative</u>

Electronic Mail  Thomas F. Hennessy
                 Virginia Family & Employment Law Center
                 4015 Chain Bridge Road, Suite G
                 Fairfax, VA 22030

<u>Agency Representative</u>

Electronic Mail  Laura J. Carroll
                 Department of Homeland Security
                 Associate Counsel
                 Office of the Principal Legal Advisor
                 70 Kimball Avenue, Room 103
                 South Burlington, VT 05403


<u>January 27, 2015</u>          /s/
   (Date)                    _____
                             JoAnn Atkinson
                             Paralegal Specialist


**Appx58**

103

**Appx59**

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **10,680words**, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, **14-pt Times New Roman**, using TypeLaw.com's legal text editor.

Dated: April 29, 2024                    By:  /s/ Tom Hennessy

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court by using the Appellate CM/ECF system on April 29, 2024. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: April 29, 2024                    By:  /s/ Tom Hennessy